**In re SAUER–DANFOSS INC.
SHAREHOLDERS
LITIGATION.**

**C.A. No. 5162–VCL.**

Court of Chancery of Delaware.

Submitted: Feb. 16, 2011.
Decided: April 29, 2011.
Revised: May 3, 2011.

Carmella P. Keener, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Chet B. Waldman, Wolf Popper LLP, New York, New York; Attorneys for Plaintiff Laurie Forrest.

Seth D. Rigrodsky, Brian D. Long, Rigrodsky & Long, P.A., Wilmington, Delaware; Lionel Z. Glancy, Andy Sohrn, Glancy Binkow & Goldberg LLP, Los Angeles, California; Attorneys for Plaintiff Kenneth Loiselle.

Seth D. Rigrodsky, Brian D. Long, Rigrodsky & Long, P.A., Wilmington, Delaware; Randall J. Baron, David T. Wissbroecker, Robbins Geller Rudman & Dowd LLP; San Diego, California; Francis A. Bottini, Jr., Shawn Fields, Johnson Bottini, LLP; San Diego, California; Attorneys for Plaintiffs in *Friese v. Sauer–Danfoss Inc., et al.,* No. LACV45714 (Iowa Dist. Ct.).

Joseph C. Schoell, Todd C. Schiltz, Drinker Biddle & Reath LLP, Wilmington, Delaware; Bradley J. Andreozzi, Justin O.

Kay, Daniel W. Werly, Drinker Biddle & Reath LLP, Chicago, Illinois; Attorneys for Defendants Sauer–Danfoss, Inc., Sven Ruder and Sven Murmann.

Raymond J. DiCamillo, Kevin M. Gallagher, Richards, Layton & Finger, P.A., Wilmington, Delaware; Brian M. Rostocki, Reed Smith LLP, Wilmington, Delaware; Herbert F. Kozlov, Lawrence J. Reina, Reed Smith LLP, New York, New York; Attorneys for Defendants Danfoss A/S, Danfoss Acquisition, Inc., Jorgen M. Clausen, Niels B. Christiansen, Kim Fausing, William E. Hoover, Jr. and Per Have.

Michael D. Goldman, Stephen C. Norman, Brian C. Ralston, Matthew D. Stachel, Potter Anderson & Corroon LLP, Wilmington, Delaware; Yosef J. Riemer, Matthew Solum, Kirkland & Ellis LLP, New York, New York; Attorneys for Defendants Steven H. Wood, F. Joseph Loughrey and Dr. Johannes F. Kirchhoff.

### OPINION

LASTER, Vice Chancellor.

The plaintiffs own an undisclosed number of shares of Sauer–Danfoss Inc. ("Sauer–Danfoss" or the "Company"). They filed suit hours after Danfoss A/S, the Company's controlling stockholder, announced a plan to launch a tender offer for the Sauer–Danfoss minority shares. After filing, the plaintiffs did not actually litigate. Instead, their counsel tried to set up a disclosure-only settlement. For disputed reasons, talks broke down. After the plaintiffs amended their complaint to assert that the defendants failed to disclose the supplemental details contemplated by the abandoned settlement, Danfoss and the Company voluntarily disclosed the information. Danfoss later withdrew its tender offer, mooting the litigation. The plaintiffs' law firms now seek an award of $750,000, ostensibly for conferring a corporate benefit in the form of supplemental disclosures. The defendants argue against any award.

With one exception, the twelve disclosures in question would not have provided consideration for a settlement and will not support a fee award. One of the disclosures was made at a time when the plaintiffs had not yet asserted a disclosure claim, much less a claim that was meritorious when filed. Ten disclosures were not material, conferred no benefit on stockholders, and will not support a fee. That leaves one: a disclosure correcting an errant description of the 52–week high and related measuring period for the trading price of the Company's common stock. For that disclosure, I award $75,000.

## I. FACTUAL BACKGROUND

The facts are drawn from the record presented in connection with the fee dispute. Because the plaintiffs never engaged in meaningful litigation activity, the record is sparse. It consists primarily of the public disclosures filed by Danfoss and the Company.

### A. The Proposal

Danfoss is one of the largest industrial companies in Denmark. Directly or through affiliates, Danfoss controls approximately 75.7% of the outstanding common stock of Sauci–Danfoss, a Delaware corporation. Sauer–Danfoss is a worldwide leader in the design, manufacture and sale of engineered hydraulic, electric and electronic systems and components for use primarily in applications of mobile equipment.

On December 22, 2009, Danfoss announced its intention to launch a tender offer during the first week of January 2010 for the outstanding shares of Sauer–Danfoss common stock that Danfoss did not already own. The contemplated offer

price was $10.10 per share, representing a premium of 19.7% over the $8.44 closing price of Sauer–Danfoss stock on December 18, 2009, the last full trading day before Danfoss notified the Sauer–Danfoss board of its intention to commence a tender offer.

In response, Sauer–Danfoss issued a statement confirming that it had received notice of Danfoss's intent to launch a tender offer. The statement noted that although no tender offer had yet been launched, the Sauer–Danfoss board of directors had empowered a special committee of non-management, independent directors (the "Special Committee") to consider any tender offer that might be made and to determine how to respond. Sauer–Danfoss also announced that the Special Committee had retained Kirkland & Ellis LLP as its independent legal counsel.

Several familiar entrepreneurial law firms quickly filed lawsuits in response to the announcements. On December 23, 2009, the day after the announcements, the first putative class action was filed in this Court. Half an hour later, a substantively identical putative class action was filed in Iowa state court. *See Friese v. Sauer–Danfoss Inc., et al.,* No. LACV45714 (Story Cty. Dist. Ct.) (the "Iowa Action"). An hour and a half after that, a second putative class action was filed in this Court. Each of the quickly filed complaints alleged that the price in the yet-to-made tender offer was inadequate, that Danfoss had breached its fiduciary duties by announcing its intention to proceed with a tender offer, and that the directors on the Sauer–Danfoss board breached their fiduciary duties by responding to the not-yet-commenced offer. The complaints elided over the temporal difficulties inherent in challenging future events.

**B. The Special Committee Works While The Plaintiffs Wait.**

After filing suit, the plaintiffs did not seek any relief or otherwise try to litigate. Instead, they waited for a transactional development that might provide a basis for settlement.

Meanwhile, on January 8, 2010, Danfoss announced that it was delaying the formal launch of its tender offer pending further discussions with the Special Committee. That same day, the Delaware plaintiffs sent a letter to the Special Committee. The letter stated that based on the analysis of their financial expert, the Delaware plaintiffs believed that $10.10 per share was inadequate. Counsel asked to meet with the Special Committee and its representatives to discuss the offer. The Special Committee did not respond.

On January 15, 2010, Danfoss announced that it was further delaying the tender offer pending additional discussions with the Special Committee. On February 3, the Iowa plaintiffs sent a letter of their own to the Special Committee asserting that the proposed price was inadequate. On February 4, the Delaware plaintiffs sent the Special Committee a second letter reiterating their views on price and again requesting a meeting. The Special Committee did not respond to either letter.

Between February 16 and 24, 2010, Sauer–Danfoss senior management prepared updated internal projections that reflected the Company's strong results in January and suggested better-than-expected sales and earnings for 2010. Senior management provided the projections to the Special Committee on February 24, 2010. With the new projections in hand, the Special Committee pushed Danfoss for a higher price.

## C. The Tender Offer

On March 9, 2010, Danfoss announced that it would launch a tender offer at $13.25 per share. Danfoss filed its Schedule TO on March 10. That document disclosed that Danfoss initially contemplated offering $10.10 per share but agreed to increase the price after discussions with the Special Committee. In turn, after consulting with its financial advisor, Lazard Frères & Co. ("Lazard"), the Special Committee agreed to recommend in favor of the higher price. The offer was conditioned on tenders from (i) a majority of the minority shares and (ii) sufficient shares to give Danfoss ownership of at least 90% of the outstanding stock. The majority-of-the-minority condition was non-waivable.

On March 19, 2010, Sauer–Danfoss filed its Schedule 14D–9. The board recommended in favor of the $13.25 per share offer. Also on March 19, Sauer–Danfoss filed a Schedule 13E–3 attaching the banker's book prepared by Lazard.

## D. Setting Up A Disclosure–Only Settlement

Around March 15, 2010, the parties began discussing settlement. They entered into a confidentiality agreement, and the defendants agreed to produce some 2,000 pages of non-public documents. The package included the standard categories of documents that defendants routinely produce to facilitate a disclosure-only settlement: minutes; financial presentations; and communications between the Special Committee and Danfoss. The plaintiffs never filed any document requests or interrogatories, never took any depositions, and never engaged in anything resembling traditional, adversarial discovery. The transmittal and receipt of the standard package marked the only "discovery" that took place in the litigation.

On March 25, 2010, during settlement discussions, the Iowa plaintiffs wrote to Danfoss and identified purported disclosure violations in the tender offer documents. At the time, none of the plaintiffs had amended the complaints they hastily filed on December 23. None of the as-filed complaints actually asserted a disclosure claim.

Among other things, the March 25 letter demanded that Sauer–Danfoss disclose: "with respect to Lazard's Selected Comparable Companies analysis, ... the selection criteria for Lazard's choice of public company comparables, including the basis for inclusion of [the] Company's customers and Mid–Cap industrials." Long Letter, Ex. 4, at 2. On the same day, Sauer–Danfoss received a letter from the Securities and Exchange Commission requesting a similar disclosure.

On March 31, 2010, Sauer–Danfoss filed a supplemental disclosure that stated the following:

> Lazard used the following criteria in selecting comparable companies:
>
> ● Publicly traded companies that make hydraulics components and equipment and are competitors to the Company. Sun Hydraulics is a publicly traded hydraulics company, but was excluded because at the time of the final analysis there was not any updated research coverage on the company that provided forward earnings estimates that Lazard could use to calculate trading multiples. Furthermore, Sun Hydraulics' primary focus is on different product categories than those of the Company.
>
> ● Publicly traded customers of the Company with exposure to the same end markets and earnings cycles as the Company.
>
> ● Mid-cap industrial companies with market capitalization of between $500

million and $2 billion which also have cyclical industrial end market exposure.

Other than the exception of Sun Hydraulics noted above, these criteria were applied consistently and no exclusions were made.

Amendment No. 1 to Sauer–Danfoss Schedule 14D–9, at 3–4.

Settlement discussions continued through April 3, 2010. The parties disagree about whether they reached an agreement in principle on eleven additional supplemental disclosures to resolve the action. It is undisputed that the defendants provided drafts of the proposed disclosures to the plaintiffs, who responded with comments. The defendants say they had a deal, but the plaintiffs reneged when the defendants would not meet their fee demand. The plaintiffs say only that talks broke down.

### E. Supplemental Disclosure And A Price Bump

On April 1, 2010, the Delaware plaintiffs filed a verified amended and consolidated class action complaint (the "Amended Complaint"). The Amended Complaint alleged for the first time that the defendants breached their duty of disclosure in connection with the transaction. In substance, the Amended Complaint identified twenty-eight purported disclosure violations, including the eleven matters that had been the subject of settlement discussions. The Amended Complaint dropped the plaintiffs' prior claim that the tender offer price was inadequate.

On April 1, 2010, Mason Capital Management LLC ("Mason Capital") issued a press release announcing that "it [did] not intend to tender its shares" because it believed the price was inadequate. App. to Defs.' Ans. Br., Ex. G. Mason Capital owned 1.94 million shares, representing 17% of the public float and making it the largest single minority shareholder.

On April 5, 2010, Danfoss filed a further amendment to its Schedule TO. On April 5 and 6, 2010, Sauer–Danfoss twice amended its Schedule 14D–9. The amendments disclosed the eleven items that the parties had discussed as part of a potential settlement. I discuss the specific items below. *See* Part II.A.2.b, *infra.*

On April 7, 2010, Mason Capital issued a press release suggesting that Sauer–Danfoss's business was improving and warranted a higher price. The firm reiterated its decision not to tender. The press release also stated that the supplemental disclosures in the amended Schedule TO and Schedule 14D–9 "only strengthened its view that the current offer of $13.25 per share materially undervalues [Sauer–Danfoss]." App. to Defs.' Ans. Br., Ex. J.

On April 9, 2010, Danfoss increased the tender offer price to $14.00 per share, saying that this was its "best and final offer price." Danfoss explained that it had decided to increase the offering price after discussions with the Special Committee and Mason Capital. Danfoss extended the tender offer to April 29, 2010.

### F. The Tender Offer Fails To Garner A Majority Of The Minority Shares.

On April 15, 2010, Sauer–Danfoss management informed the Special Committee that preliminary first-quarter financial results were stronger than expected. Management also informed the Special Committee that it had again preliminarily increased its sales forecast for the year and was evaluating further increases to its EBITDA and EBIT forecasts. The Company issued a press release announcing the information and advised stockholders not to rely on the Special Committee's prior recommendation. The next day, Sauer–Danfoss issued a press re-

lease indicating that the Special Committee had asked management to prepare updated projections covering 2010 through 2012. The Company again advised stockholders not to rely on the Special Committee's prior recommendation.

On April 22, 2010, the plaintiffs moved to file a second amended complaint (the "Second Amended Complaint"). With their disclosure claims mooted, the plaintiffs resurrected their previously abandoned price-inadequacy claim. I granted the motion, and the Second Amended Complaint was formally filed on May 3, 2010.

On April 23, 2010, the Special Committee withdrew its recommendation in favor of the offer and recommended that the shareholders reject the $14.00 price. On April 25, the Special Committee told Danfoss they could support a price of $21.50 per share. Danfoss declined to increase its offer. On April 29, the tender offer closed with only 20% of the minority shares tendered. The offer failed to satisfy the majority-of-the-minority condition, and Danfoss did not acquire any shares.

By order dated May 13, 2010, I dismissed the Delaware action as moot but retained jurisdiction to consider any fee application the plaintiffs might make. The dismissal order permitted the plaintiffs in the Iowa suit, if they desired, to file an application with this Court. Commendably, the Iowa plaintiffs dismissed their suit, and on June 11, they joined the Delaware plaintiffs in making a joint fee application. By doing so, they responsibly avoided forcing two courts to expend judicial resources addressing an identical issue and saved the stockholders whom they purported to represent the cost of having their corporation pay for defense counsel to oppose two fee applications.

## II. LEGAL ANALYSIS

■■■ When a plaintiff pursues a cause of action relating to the internal affairs of a Delaware corporation and generates benefits for the corporation or its stockholders, Delaware law calls for the plaintiff to receive an award of attorneys' fees and expenses determined based on the factors set forth in *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del.1980). The stockholder need not have sued in a representative capacity, and the Court need not have certified a class. *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1165 (Del.1989). Likewise, the benefit need not have resulted from a litigated judgment or settlement. *Rosenthal v. Burry Biscuit Corp.*, 209 A.2d 459, 460 (Del.Ch.1949) (Seitz, V.C.). If the defendants take action to moot the dispute, then the plaintiff can seek an award. *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980); *Burry Biscuit*, 209 A.2d at 460. To obtain a fee in a mooted case, the plaintiff must show that "(1) the suit was meritorious when filed; (2) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit." *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

### A. Meritorious When Filed

■■ Over four decades ago, the Delaware Supreme Court established the test for determining whether a suit is "meritorious when filed." *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del.1966).

A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ulti-

1124

mate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.

*Id.* The complaint cannot have been "a series of unjustified and unprovable charges of wrongdoing to the disadvantage of the corporation." *Id.* Instead, "[t]he plaintiff must have some factual basis at least for the making of the charges. If there is none, then the conclusion follows that the action lacked merit and the plaintiff is entitled to no allowance for fees." *Id.*

Fourteen years after *Dann,* the Delaware Supreme Court was asked to revisit the meritorious-when-filed test. In *Allied Artists,* the Delaware Supreme Court rejected the contention that in a settled or mooted case, "it should not matter whether the suit had legal merit," so long as the action resulted in some benefit to stockholders. *Allied Artists,* 413 A.2d at 879.

The court reasoned that such a rule would contradict Delaware's public policy of "discouraging baseless litigation." *Id.* Since then, the Delaware Supreme Court has adhered consistently to the "meritorious when filed" test.[1]

Fixating on the words "when filed," the defendants argue that the plaintiffs cannot receive a fee award because the only benefits achieved by the case were supplemental disclosures, and the complaints that quickly appeared on December 23, 2009, were premature, unripe, and did not assert disclosure claims. I need not consider whether the substantive challenges to the tender offer were ripe under *In re Cox Communications, Inc. Shareholders Litigation,* 879 A.2d 604 (Del.Ch.2005), because the plaintiffs do not claim to have achieved any benefits as a result of those claims. The plaintiffs take credit only for obtaining supplemental disclosures.

---

1. *See Alaska Elec. Pension Fund v. Brown,* 988 A.2d 412, 417 (Del.2010) ("In order to be entitled to an award of fees under the corporate benefit doctrine, an applicant must show, as a preliminary matter, that: (i) the suit was meritorious when filed...."); *Alaska Elec. Pension Fund v. Brown,* 941 A.2d 1011, 1015 (Del.2007) ("To qualify for an award of attorneys' fees, counsel must show that, 'the suit was meritorious when filed....'"); *Korn v. New Castle County,* 922 A.2d 409, 412–13 (Del.2007) ("Fees may be awarded under the common fund exception if '(a) the claim was meritorious when filed....'"); *Dover Historical Soc., Inc. v. City of Dover Planning Comm'n,* 902 A.2d 1084, 1092 (Del.2006) ("Under the 'mootness' exception, a court may award attorneys' fees where the fee applicant demonstrates that: (1) the litigation was meritorious when filed...."); *Cal–Maine Foods, Inc. v. Pyles,* 858 A.2d 927, 929 (Del. 2004) ("To be entitled to an award of fees under the corporate benefit doctrine, an applicant must show that: (1) the suit was meritorious when filed ...." (internal quotation marks and alterations omitted)); *Grimes v. Donald,* 755 A.2d 388, 2000 WL 949628, at *1 (Del. May 11, 2000) (TABLE) ("Even with-

out a favorable adjudication, counsel will be compensated for the beneficial results they produced, provided that the action was meritorious ...." (internal quotation marks and alterations omitted)); *Waterside P'rs v. C. Brewer & Co.,* 739 A.2d 768, 770 (Del.1999) ("Fee shifting may ... be ordered where litigation is rendered moot through resulting action by the defendants. In [that] instance, the plaintiff must establish that: (i) the suit was meritorious when filed...."); *United Vanguard,* 693 A.2d at 1079 ("In order to be entitled to an award of fees under the corporate benefit doctrine, an applicant must show, as a preliminary matter, that: (1) the suit was meritorious when filed...."); *Tandycrafts,* 562 A.2d at 1165 ("Changes in corporate policy or, as here, a heightened level of corporate disclosure, if attributable to the filing of a meritorious suit, may justify an award of counsel fees."); *Chi. Milwaukee Corp. v. Eisenberg,* 560 A.2d 489, 1989 WL 27743, at *1 (Del. Feb. 23, 1989) (TABLE) ("Attorneys' fees and expenses may be properly granted pursuant to litigation on behalf of shareholders, provided that (i) the suit was meritorious when filed....").

At the time they hastily filed their original complaints, the plaintiffs did not and could not raise any disclosure claims for the simple reason that none of the defendants had yet disseminated the substantive disclosure documents required by federal law. Until Danfoss filed its Schedule TO and Sauer–Danfoss filed its Schedule 14D–9, the plaintiffs could not know what the defendants actually would disclose. It was not until the Amended Complaint that the Delaware plaintiffs asserted disclosure claims. The Iowa plaintiffs never did.

■ The defendants are therefore technically correct that the December complaints did not assert any claim that was meritorious when filed and which led causally to benefits for the Sauer–Danfoss stockholders. I disagree, however, that a court awarding fees under Delaware law must look only to the original complaint. As authority, the defendants rely on *Allied Artists*, which held that "the meritoriousness determination should be made with reference to the state of the action at the time of filing." 413 A.2d at 879. The issue in *Allied Artists* was whether the plaintiff's loss on a motion for summary judgment precluded a finding that the action was meritorious when filed, not whether a court should look to the initial complaint or to an amended complaint to make that determination. The *Allied Artists* Court followed *Dann* in holding that the test for meritoriousness was whether the complaint could withstand a motion to dismiss, not whether the plaintiff later lost on summary judgment. *Id.* The *Allied Artists* Court did not hold that the pleadings-based analysis must turn on the original complaint.

Contrary to the defendants' reading *of Allied Artists*, this Court has looked to the complaint that raised the claims conferring the alleged benefit to evaluate whether the suit was meritorious when filed, particularly when the predicate facts have evolved since the initial complaint.[2] This is consistent with the liberal approach for amending pleadings that governs under Rule 15. *See* Ct. Ch. R. 15(a) (leave to amend "shall be freely given when justice so requires"); *Grace Bros., Ltd. v. Siena Hldgs., Inc.*, 2009 WL 1799120, at *1 (Del.Ch. June 5, 2009) ("[T]his Court generally grants leave to amend 'unless there is evidence of bad faith, undue delay, dilatory motive, undue prejudice or futility of amendment.'" (quoting *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 2005 WL 2093694, at *1 (Del.Ch. Mar. 30, 2005))). Federal courts likewise have looked to an amended complaint to determine whether an action was meritorious. *See, e.g., Kahan v. Rosenstiel*, 424 F.2d 161, 174 (3d Cir.1970) (holding that amended complaint "state[d] a cause of action which may be the basis for an award of counsel fees"); *Shields v. Murphy*, 116 F.R.D. 600, 605 (D.N.J.1987) (holding that claims stated in amended complaint were "meritorious for purposes of the attorney's fees analysis").

*Allied Artists* did not lock plaintiffs into their original complaint for purposes of a

---

2. *E.g., In re Triarc Cos. S'holders Litig.*, 2006 WL 903338, at *2 (Del.Ch. Mar. 29, 2006) (finding that disclosure claims in amended complaint, relating to disclosure of a proposed transaction that had not yet materialized at the time of the original complaint, were meritorious when filed); *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 362 (Del.Ch.1999) (finding that claims in third amended complaint satisfied meritorious-when-filed requirement), *aff'd sub. nom. First Interstate Bancorp v. Williamson*, 755 A.2d 388 (Del.2000); *see also Greenfield v. Frank B. Hall & Co.*, 1992 WL 301348, at *8 (Del.Ch. Oct. 19, 1992) (finding that action "was not meritorious when filed or when amended," after inquiring as to whether either original or amended complaint would have survived a motion to dismiss under Ct. Ch. R. 23.1).

fee award. To deny an award to a plaintiff who subsequently filed a meritorious amended complaint would be unnecessarily punitive. In awarding fees, a court applying Delaware law should look to the complaint that first asserted the benefit-conferring claim. If other claims in the pleading or asserted in prior iterations of the complaint were not meritorious when filed or did not confer a benefit, then the court can reduce the fee award accordingly. *See, e.g., In re BEA Sys., Inc. S'holders Litig.,* 2009 WL 1931641, at *1 (Del.Ch. June 24, 2009) (calculating fees based on estimation that "one-quarter of the time and costs are rationally attributable to the claims that resulted in the benefit"); *Triarc,* 2006 WL 903338, at *2 (denying fees for work on initial complaint concerning proposed transaction that was abandoned for reasons unrelated to litigation).

Here, because the benefits obtained were additional disclosures, the meritorious-when-filed analysis turns on the Amended Complaint. I need not consider the Second Amended Complaint, which was filed after the defendants made their supplemental disclosures and which did not assert any further disclosure claims.

### 1. The March 31 Amendment

The plaintiffs first claim credit for disclosures about Lazard's analysis that Sauer–Danfoss made on March 31, 2010, before the filing of the Amended Complaint. Sauer–Danfoss issued its original Schedule 14D–9 on March 19. On March 25, the Iowa plaintiffs wrote to Sauer–Danfoss and identified what they felt were material omissions from the Schedule 14D–9. Among other things, the Iowa plaintiffs demanded disclosure of "the selection criteria for Lazard's choice of public company comparables, including the basis for inclusion of [the] Company's customers and Mid–Cap industrials." Long

Letter, Ex. 4. On the same day, Special Counsel from the SEC's Office of Mergers & Acquisitions wrote Sauer–Danfoss with the following request about Lazard's comparable companies analysis:

Please discuss in greater detail the methodology and criteria used in selecting "companies having business and trading characteristics that [Lazard] deemed reasonably comparable to the Company." Also, indicate whether the criteria were consistently applied and, if any company was deliberately excluded from the dataset, briefly indicate the reasoning behind such exclusion.

Supp.App. to Defs.' Sur–Reply Br., Ex. S ¶ 10. On March 31, 2010, Sauer–Danfoss filed Amendment No. 1 to its Schedule 14D–9, disclosing the criteria Lazard used in selecting the public company comparables and how those criteria were applied. The plaintiffs claim credit for the disclosure. The defendants say that they made the disclosure in response to the SEC's comment letter.

When the Iowa plaintiffs sent the March 25 letter, none of the plaintiffs had asserted a disclosure claim. There was therefore no disclosure claim on file at the time of the March 25 letter that could support a fee award. The Delaware plaintiffs did not assert disclosure claims until they filed the Amended Complaint on April 1, 2010, and the Iowa plaintiffs never did. Because the plaintiffs had not yet filed a complaint asserting a meritorious disclosure claim, they cannot be awarded fees for the March 31 disclosures. *Cf. Dann,* 223 A.2d at 387.

Because the plaintiffs had not yet filed a claim, I need not consider whether, *after* a pleading asserting meritorious disclosure claims has been filed, a letter raising additional disclosure issues would be sufficient to support a mootness fee award. In the context of expedited litigation and on-going discovery, the law might not require

that every litigation demand be memorialized in a complaint before a plaintiff could receive mootness credit, particularly if the plaintiff makes clear that the request for relief would be included in an amended complaint. Here, however, the plaintiffs were not engaged in expedited litigation. They had done nothing to advance the case except write three letters. The plaintiffs were not actually litigating; they were inviting the defendants to dance the *Cox Communications* minuet.[3] Likewise, I need not consider whether the defendants have sufficiently rebutted the presumption of causation by demonstrating that they promulgated Amendment No. 1 in response to the SEC comment letter. *See Tandycrafts*, 562 A.2d at 1165 ("Once it is determined that action benefiting the corporation chronologically followed the filing of a meritorious suit, the burden is upon the corporation to demonstrate that the lawsuit did not in any way cause their action." (internal quotation marks omitted)). A strong argument has been made that they did.

### 2. The April 5 and 6 Amendments

■ The plaintiffs next claim credit for eleven supplemental disclosures that the plaintiffs sought in the Amended Complaint and which the defendants made on April 5 and 6. For a disclosure claim to be meritorious when filed and provide a compensable benefit to stockholders, the supplemental disclosure that was sought and obtained must be material. *Cf. Campbell v. The Talbots, Inc.*, 5199–VCS, at 19–35 (Del. Ch. Dec. 20, 2010) (TRANSCRIPT) (analyzing value of disclosures in settlement based on their materiality). Conversely, if a complaint does not identify a material misstatement or omission, it cannot survive a motion to dismiss and therefore is not meritorious. *Compare Khanna v. McMinn*, 2006 WL 1388744, at *29 (Del. Ch. May 9, 2006) (holding that disclosure claim may be dismissed for failure to plead materiality if court "is satisfied with reasonable certainty that no set of facts could be proved that would permit the plaintiffs to obtain relief under the allegations made"), *with Dann*, 223 A.2d at 387 ("A claim is meritorious . . . if it can withstand a motion to dismiss . . . ."). Under Delaware law, as under federal law, the materiality standard requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the rea-

3. *See Brinckerhoff v. Texas E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 374, 384–87 (Del.Ch. 2010) (describing ritualized *Cox Communications* settlement dance); Elliott J. Weiss & Lawrence J. White, *File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions*, 57 Vand. L.Rev. 1797, 1817 (2004) ("In the case of almost every squeeze out and MBO, a plaintiffs' attorney could anticipate that the price finally agreed to by the SNC would be higher than the price originally offered by the controlling shareholder. . . . Consequently, by supplementing her complaint with a presentation to the SNC of her reasons for believing that the target company's stock is worth more than the price originally offered, a plaintiffs' attorney also could put herself in a position to claim some credit for whatever increase in price was then negotiated by the SNC and to demand compensa-

tion for her efforts."); *id.* at 1818 ("[W]e found that SNCs regularly invite plaintiffs' attorneys to present their arguments regarding valuation before those committees finally decide on what terms they will approve a squeeze out. . . . [I]nviting a plaintiffs' attorney to 'participate' in its deliberations may allow an SNC to purchase what might be termed 'litigation insurance' at relatively modest cost."); *id.* at 1818 n. 77 ("In every settled case we examined that involved an SNC, plaintiffs' brief in support of the proposed settlement recited that plaintiffs' attorneys had been invited to present their views to the defendant corporation's SNC"). *See generally Cox Commc'ns*, 879 A.2d at 619–23 (describing ritualized two-track negotiation process for settling stockholder litigation challenging a controller freeze-out transaction).

sonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Remedying an immaterial omission through supplemental disclosure does not benefit stockholders and will not support a fee award.

I address each of the eleven disclosures in turn. With one exception, none was material. Before considering the disclosures individually, I address two arguments advanced by the plaintiffs in an effort to avoid a disclosure-by-disclosure analysis.

### a. The Blanket Arguments

First, the plaintiffs assert that because the defendants decided to make the supplemental disclosures and moot those aspects of the Amended Complaint, the information must have been material. Pls.' Opening Br. at 19–20. If subsequent mooting supported an inference of merit, then the meritorious-when-filed inquiry would become redundant in a mootness case, where by definition the defendants have mooted the plaintiff's claims. In *Allied Artists,* the Delaware Supreme Court held that a plaintiff still must meet the meritorious-when-filed element, even in a mooted case, because of its "concern[ ] with discouraging baseless litigation." *Allied Artists,* 413 A.2d at 879.

Second, the plaintiffs contend that I need not delve into the materiality of the supplemental disclosures because Mason Capital allegedly "made its decision not to tender based primarily on information disclosed directly as a result of Plaintiffs' efforts." Pls.' Reply Br. 10. The plaintiffs point out that Mason Capital announced it would not tender *after* the defendants made the first supplemental disclosures,

and that Mason Capital responded to the next batch of supplemental disclosures by issuing a press release stating that the additional disclosures "strengthened its view that the current offer of $13.25 materially undervalue[d] [Sauer–Danfoss]." App. to Defs.' Ans. Br., Ex. J.

Mason Capital's press releases do not confer blanket materiality on the eleven supplemental disclosures. As a threshold matter, Delaware's plaintiff-friendly presumption that action results from counsel's efforts does not apply to Mason Capital. The presumption applies only to actions taken by the defendants. *Cf. Alaska Elec.,* 988 A.2d at 417 (explaining that presumption of causation applies "[w]here … *a defendant* takes action subsequent to the complaint that renders the claims asserted moot" (emphasis added)). The plaintiffs are therefore not entitled to a presumption that Mason Capital did not tender because of the supplemental disclosures.

Nor can I rely blindly on Mason Capital's public statements. Mason Capital is a hedge fund. If nothing else, hedge funds are rational profit maximizers. Hedge funds write letters and issue press releases to serve their own interests. Mason Capital made its disclosures because it opposed the transaction and self-interestedly wanted to block the deal, not to express an unbiased view on the materiality of the supplemental disclosures. The Mason Capital press releases are nice atmospheric factors for the plaintiffs, but they do not replace this Court's obligation to assess materiality independently.

### b. The Eleven Disclosures

Because the plaintiffs' blanket arguments do not relieve this Court of its obligation to determine whether the disclosure claims were meritorious when filed, I must review the eleven allegedly beneficial items. Only one was material.

■ First, the Schedule TO stated that the Tender Offer price of

> $13.25 per share is greater than ... the 52 week high closing price of [Sauer–Danfoss common stock] of $12.70 on January 20, 2010, which occurred following [Danfoss's] announcement that it intended to make the [Tender Offer]. Prior to that announcement, the 52 week high closing price was $9.75.

Schedule TO, Ex. (A)(1)(I) (hereinafter "Offer to Purchase"), at 22. According to the Amended Complaint, this statement did not define the 52–week period for which $9.75 was the purported high price and provided inaccurate pricing information, because prior to January 20, 2010, the 52–week high closing price was $12.49 on January 19, 2010. Compl. ¶ 55(b). On April 5, 2010, Danfoss disclosed the following:

> The Offer Price of $13.25 per Share is greater than the *52* week high closing price of the Shares of $12.70 on January 20, 2010, for the period ending March 8, 2010, which occurred following our December 18, 2009 notification to the Board that we intended to make the Offer. Prior to that notification, the 52 week high closing price was $9.90 on January 6, 2009.

Amendment No. 3 to Danfoss Schedule TO, at 7. The plaintiffs claim credit for fixing what they say was inaccurate information.

Danfoss's original disclosure was vague about the end date for the 52–week period during which the high occurred at $12.70 on January 20, 2010. A reader would infer that the end date approximated the date of the Schedule TO, which was issued on March 10. The original disclosure then explained that this price was achieved *after* the public announcement of the planned tender offer, suggesting that anticipation of the transaction inflated the market price. The Schedule TO compared this price with the 52–week period ending "[p]rior to that announcement," implying an end-date of December 22.

The supplemental disclosure established the end date for the initial 52–week period as March 8, rather than March 10. The supplement likewise fixed the end date for the other 52–week period by changing the original reference from the announcement of the contemplated tender offer to the December 18 notification to the Sauer–Danfoss Board. The supplemental disclosure also corrected the 52–week high during the period ended December 18, which was $9.90 on January 6, 2009. That price was also the 52–week high for the period ended December 22, which meant the Schedule TO's reference to $9.75 was a careless mistake.

Reputable media publications have long known that fact-checking has value, and they pay people to do it. Here, the plaintiffs provided that service, and the first corrective disclosure provided a compensable benefit.

■ Second, the Amended Complaint pointed to a statement on page 5 of Schedule E of the Offer to Purchase (which disclosed the changed projections for 2010) to the effect that "[Sauer–Danfoss] Management at this moment in time has no information that supports altering the projection for 2012." The plaintiffs observed that a chart on page 2 of Schedule E altered the 2012 sales growth projections from 13% in the January projections to 8% in the February projections without explaining why the projection was changed. The Amended Complaint asked "why?"

On April 6, Sauer–Danfoss disclosed that:

> Although the Updated Management Projections had a higher sales growth rate for 2009–10 and a lower sales

growth rate for 2011–12 as compared to the Management Projections, management's expectations regarding the overall sales growth rate from the end of 2009 to the end of 2012 remained the same in the Updated Management Projections as in the Management Projections.

Amendment No. 3 to Sauer–Danfoss Schedule 14D–9, at 3. This supplemental disclosure states what an investor could determine from the original disclosure. The description of the Updated Management Projection stated that management was projecting higher-than-expected sales for 2010, but there was "[n]o new information available that would suggest a change to the outlook for 2012." Offer to Purchase, Schedule E at 2. Consistent with this statement, the chart on page 2 of Schedule E showed an increase in projected 2010 sales from $1,250,000 to $1,340,000, but no change in projected 2012 sales. The description revealed that "[m]anagement rationalized the sales for 2011 based on 2010 and 2012," *id.*, and the chart showed a corresponding increase in 2011 sales from $1,372,500 to $1,433,800, smoothing out the growth from 2010 to 2012. As a result of the lack of change in 2012, the forecasted increase in sales growth for that year declined. Long division provides the explanation that the plaintiffs demanded. When Year 3 projections remain the same, but projections for Years 1 and 2 increase relative to Year 3, then there is less growth from Year 1 or 2 to Year 3. If both Year 0 and Year 3 remain the same, then there is no change in the overall growth from Year 0 to Year 3. Increasing the projections for Years 1 and 2 will change the annual growth rates but will not change the overall growth rate. The supplemental disclosure was immaterial and did not benefit stockholders.

■ Third, the Amended Complaint noted that according to page 15 of the Schedule 14D–9, "[o]n February 10, 2010, K & E and Reed Smith spoke twice by telephone to discuss the 90% Condition and related legal issues. K & E indicated the Special Committee's preference that the 90% Condition be eliminated from the offer." The plaintiffs objected that the Schedule 14D–9 failed to disclose the Special Committee's rationale for eliminating the 90% Condition. Compl. ¶ 56(f). Again, the Amended Complaint asked "why?"

The amended Schedule 14D–9 explained that the Special Committee sought to remove the condition "as doing so would have the effect of making the proposed offer less conditional, thereby increasing the likelihood it would be consummated." Amendment No. 3 to Sauer–Danfoss Schedule 14D–9, at 3. The amended Schedule 14D–9 also disclosed that "the Special Committee considered the fact that, in order for the majority of the minority condition to be satisfied, Danfoss would need to own approximately 88% of the Company Common Stock upon the expiration of the offer, and that it was unlikely this percentage threshold would be satisfied but the 90% Condition would not be." This was not a material disclosure.

■ Delaware law does not require that a fiduciary disclose its underlying reasons for acting. *Newman v. Warren*, 684 A.2d 1239, 1245–46 (Del.Ch.1996) (Allen, C.). In *Newman*, the board of directors of Professional Sports Care Management, Inc. ("PSCM") unanimously recommended that its stockholders approve a stock-for-stock merger. *Id.* at 1242. A holder of 100 shares of PSCM common stock filed a class action and sought a temporary restraining order against the deal because the proxy statement failed to disclose (i) "the reasons that one of the directors of PSCM (Mr. Wiggins) . . . opposed board

action to further pursue negotiations with [the acquirer]"; (ii) "why at the same meeting another PSCM director (Mr. Milligan) ... abstained from expressing a view on that question," and (iii) "why these two and another director (Mr. Barnes) were absent from the board meeting of May 16 at which the board did approve and recommend the transaction." *Id.* at 1240. Chancellor Allen held that Delaware law

> requires full and candid disclosure of *all material facts.* It does not ... require in addition that individual directors state (or the corporation state for them) the grounds of their judgment for or against a proposed shareholder action.... The board or the corporation may of course in all events choose to state reasons for a board recommendation. If that is done, the statement of those reasons must, of course, be true and not misleading.

*Id.* at 1246 (internal citations omitted).

As in *Newman,* the Amended Complaint did not state a claim when it sought disclosure of the directors' reasons for seeking to remove the 90% condition. The Schedule 14D-9 accurately informed stockholders of the material fact that the Special Committee negotiated on their behalf to attempt to remove the condition, but failed. Asking "why" does not state a meritorious disclosure claim. *Id.; see also Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 145 (Del.1997) (affirming dismissal of a claim that did not identify disclosure violations but rather "pose[d] a question"). Accordingly, this disclosure was not material, did not benefit stockholders, and will not support a fee award.

Fourth, the Amended Complaint observed that Danfoss only retained a financial advisor (Ladenburg Thalmann & Co., hereinafter "Ladenburg") to conduct a "premiums analysis." Again, the plaintiffs asked "why," complaining that the Schedule TO "fails to disclose why Ladenburg was retained by Danfoss A/S only to undertake a premiums analysis of comparable transactions and not a full valuation analysis of Sauer-Danfoss." Compl. ¶ 55(g).

> On April 5, Danfoss disclosed that:
> Parent engaged Ladenburg to conduct a premiums analysis only. Parent considered whether a full valuation analysis would be beneficial to Parent in connection with the proposed transaction, but determined that due to its extensive experience and understanding of the business of the Company and the industry in which the Company operates, Parent had its own views of the value of the Company and what it was willing to pay for the Shares and that such an analysis would not materially influence Parent's own view of the price per Share it would be willing to pay or otherwise serve a useful purpose or be a beneficial use of the Parent's time or resources.

Amendment No. 3 to Danfoss Schedule TO. This "why" claim fails under *Newman. See* 684 A.2d at 1245–46; *see also In re Siliconix Inc. S'holders Litig.,* 2001 WL 716787, at *12 (Del.Ch. June 21, 2001) (holding that basis for controlling stockholder's selection of tender offer price "is not the type of information that would likely influence (even in the absence of a premium to market) a shareholder's decision not to tender"). The Schedule TO accurately stated that Danfoss obtained a premiums analysis and attached a copy of that analysis. This supplemental disclosure was immaterial and did not benefit stockholders.

█ Fifth, page 16 of the Schedule 14D-9 disclosed that "[o]n the morning of February 24, 2010, the Company's senior management sent to the Special Committee, Lazard and K & E revised Updated

Preliminary 2010 Projections that had been approved by senior management (the 'Updated Revised 2010 Projections')." The Schedule 14D–9 next observed that although the Updated Revised 2010 Projections were higher than the prior Management Projections, they were lower than internal projections prepared by Sauer–Danfoss's accounting, sales, and marketing staff. The plaintiffs complained that the Schedule 14D–9 "fails to disclose the reasons why the 'Updated Revised 2010 Projections' (as defined in the [Schedule 14D–9]) were modified and reduced by senior management." Compl. ¶ 56(g). This was another "why?"

On April 6, Sauer–Danfoss disclosed that the adjustments were made "due to the uncertainty around sales development in the second half of 2010." Amendment No. 3 to Sauer–Danfoss Schedule 14D–9. It was implicit in the original disclosure that the senior management was more conservative than staff. The revelation that senior management adjusted the projections downward because of uncertainty about sales performance added nothing. If the defendants had disclosed some other reason for the adjustment, such as a specific reason that sales were tailing off, then that fact might have been material. Because the supplemental disclosure did not remedy a material omission, this disclosure did not benefit the shareholders and will not support a fee award.

Sixth, the Amended Complaint criticized the Schedule 14D–9 for failing to disclose whether any of the projections it described "were adjusted to remove the expenses related to Sauer–Danfoss maintaining its status as a public company." Compl. ¶ 56(h). The amended Schedule 14D–9 disclosed that "[t]he Updated Management Projections were not adjusted to remove any expenses related to the Company maintaining its status as a public company.

Management considered the amount of such expenses on an annual basis to be immaterial to the Company's overall projected performance." Amendment No. 3 to Sauer–Danfoss Schedule 14D–9, at 3.

A plaintiff does not state a disclosure claim by asking whether or not something happened. Omitting a statement that the board *did not* do something is not material, because "requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless." *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del.Ch.1999). If a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen. *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 204 (Del.Ch.2007) ("[S]o long as what the investment banker did is fairly disclosed, there is no obligation to disclose what the investment banker did not do."). A supplemental disclosure explicitly stating that the board and its advisors did not adjust its projections was immaterial and did not benefit stockholders.

 Seventh, the Amended Complaint observed that on page 27 of the Schedule 14D–9, Lazard was said to have calculated a terminal value for its discounted cash flow "using an earnings before interest, tax, depreciation and amortization ("EBITDA") exit multiple range of 6.00x to 7.50x." The plaintiffs complained that the Schedule 14D–9 "fail[ed] to disclose Lazard's methodology/rationale for arriving at this range, and why the selected range is lower than the range of 10.1x to 14.2x indicated by the Hydraulic Peers, lower than the 8.4x median of Selected Customers and lower than the 9.8 median of Mid–Cap Industrials," each of which were multiples of historical 2009 earnings as opposed to

projected future earnings, and which appeared in Lazard's presentation to the Committee, attached as Exhibit (A)(5)(B) to the Schedule 13E–3 filed March 19. Compl. ¶ 56(i). This was another "why?" The amended Schedule 14D–9 explained that "Lazard used an EBITDA exit multiple range of 6.0x to 7.5x based on the long-term EBITDA trading multiple averages for the Company" and "[t]his exit multiple range also resulted in implied free cash flow perpetuity growth rates that Lazard considered to be appropriate for an industrial company such as the Company." Amendment No. 3 to Sauer–Danfoss Schedule 14D–9.

When a plaintiffs "only beef is that [an investment banker] made mistakes in subjective judgment, even though those judgments were disclosed to the ... stockholders," then the plaintiff has not identified a material omission or misstatement. *In re JCC Hldg. Co.*, 843 A.2d 713, 721 (Del.Ch. 2003). The original Schedule 14D–9 disclosed the multiples the banker selected for the discounted cash flow analysis, and both the original Schedule 14D–9 and the original Schedule 13E–3 disclosed the multiples implied by the companies deemed comparable for purposes of the comparable companies transaction. The summary of the discounted cash flow analysis did not mislead stockholders into thinking that the discounted cash flow analysis's exit multiple range was derived from the comparable companies. It was obvious from the disclosures that the bankers exercised their subjective judgment. The additional information was immaterial.

Eighth, the Amended Complaint observed that on page 28 of the Schedule 14D–9, it stated that "Lazard applied EBITDA multiples of 8.0x to 9.0x to the Company's calendar year 2010 estimated EBITDA based on the Financial Forecasts." The plaintiffs complained that the

median EBITDA multiple for each of the peer groups analyzed by Lazard exceeded 9.0x and that the Schedule 14D–9 failed to disclose why Lazard selected a below-median multiple. Compl. ¶ 56(m). This was another "why?" Sauer–Danfoss explained that

> [t]he range was determined considering the actual trading multiples of Parker–Hannifin Corporation and Eaton Corporation at the time of the analysis but discounted to recognize that both Parker Hannifin Corporation and Eaton Corporation are much larger, more diversified companies than the Company and the fact that the Company expects to post losses in 2010 and 2011.

Amendment No. 3 to Sauer–Danfoss Schedule 14D–9, at 4. This disclosure was not material.

A "quibble with the substance of a banker's opinion does not constitute a disclosure claim." *JCC*, 843 A.2d at 721. The original Schedule I4D–9 disclosed the calculation of the comparable companies' multiples and the banker's selection of a multiple for Sauer–Danfoss based on those multiples "in a manner that allowed a reasonably sophisticated investor to see the key judgments that [the banker] made and to make her own independent determination of whether those judgments struck her as proper." *Id.* After the language attacked by the plaintiff, the very next paragraph of the original Schedule 14D–9 stated that

> Lazard noted in its presentation to the Special Committee that the Eaton Corporation and the Parker–Hannifin Corporation are both much larger diversified industrial companies with strong balance sheets and more stable performance than the Company, and who are expected to post profits through 2011 whereas the Company is expected to post losses through 2011, and hence like-

ly warrant higher trading multiples than the Company.

The original Schedule 14D–9 therefore already explained the rationale for Lazard's subjective judgment that these companies merited higher multiples than Sauer–Danfoss. The additional explication gave stockholders no new information.

■ Ninth, page 11 of the Schedule 14D–9 stated that:

On January 6, 2010, Reed Smith informed the Company's general counsel that, in connection with the proposed offer, Danfoss intended to disclose certain non-public financial information regarding the Company that was in Danfoss'[s] possession. The Company's general counsel informed K & E of Danfoss'[s] intention in this regard. Later that day, K & E contacted Reed Smith to express the Special Committee's concerns regarding the disclosure of any of the Company's non-public financial information in connection with the proposed offer. In particular, the Special Committee was concerned that the disclosure of such information could be harmful to the Company from a competitive standpoint and/or could confuse stockholders, investors and the marketplace in general. K & E indicated that the Special Committee objected to the disclosure of such information, particularly to the extent the information had been obtained by Danfoss from its affiliates who are directors of the Company, and that the Special Committee needed to fully understand what information Danfoss intended to disclose and the implications of such disclosure.

The Amended Complaint objected that the Schedule 14D–9 failed "to disclose the precise nature of the non-public information in Danfoss A/S's possession and how this issue was resolved." Compl. ¶ 56(r). The amended Schedule 14D–9 disclosed that the confidential information "consisted primarily of information regarding the Company's .business, strategy, competitors, competitive position, 2010 budget and projected financial information." Amendment No. 3 to Sauer–Danfoss Schedule 14D–9, at 3. The amendment further disclosed that the issue "was subsequently rendered moot when Danfoss was informed about the existence of the Management Projections and the parties agreed that such projections would be disclosed in connection with any proposed offer."

This explanation could not have been material to any shareholder. It stated the obvious. Any reasonable stockholder would have concluded from the initial disclosure that Danfoss wanted to disclose information that was sensitive because it contained insights into Sauer–Danfoss's competitive position, strategy, and internal financial information. That is all the supplemental disclosure says. The supplemental disclosure was not material information.

■ Tenth, pages 12 to 13 of the Schedule 14D–9 disclosed that:

On January 19, 2010, the Special Committee held a telephonic meeting with K & E and Lazard. At the meeting, Lazard discussed its preliminary analysis regarding the proposed offer and the Company's valuation. The parties also discussed, among other matters, the Management Projections and the significance, in the context of the proposed offer, of the New Credit Agreement and Danfoss'[s] role as the major creditor of the Company. Following the discussion of Lazard's preliminary analysis and the discussion of these other matters, the Special Committee determined that the offer price of $10.10 was inadequate. The Special Committee instructed Lazard to have a meeting with Ladenburg to convey the Special Committee's deter-

mination in this regard and to discuss the proposed offer price and the valuation of the Company.

The Amended Complaint objected to the failure to "disclose the substance of these discussions." Compl. ¶ 56(s). The amended Schedule 14D–9 disclosed that the discussion addressed "the New Credit Agreement, Danfoss'[s] role as the major creditor of the Company and the leverage these facts may or may not provide the Special Committee in its negotiations with Danfoss." Amendment No. 3 to Sauer–Danfoss Schedule–14D–9, at 3.

This supplemental disclosure explained that when the Committee and its advisors discussed "the significance" of the debtor-creditor relationship between Danfoss and Sauer–Danfoss, they were specifically discussing how that relationship affected the Committee's "leverage." It is difficult to imagine what else a reasonable stockholder would have thought the Special Committee and its advisors were talking about. The only "significance" that relationship could have "in the context of the proposed offer" was for the parties' respective negotiating positions, *i.e.*, their leverage. The supplemental disclosure again stated the obvious.

▮▮▮ Finally, page 14 of the Schedule 14D–9 reported that Danfoss regarded management's projections as "overly optimistic." The plaintiffs complained that the Schedule 14D–9 did not explain why. Compl. ¶ 56(t). The amended Schedule 14D–9 explained that Danfoss held this view "due to the Company's failure to meet its past projections and the significant increase in projected performance of the Company from the projections that management prepared just a few weeks before, in early January, to the more recent projections."

There are at least three reasons why this final supplemental disclosure did not remedy a material omission. First, the claim simply asked "why?" Second, the original Schedule 14D–9 already disclosed on page 13 that "Danfoss was skeptical of the Management Projections based on the Company's failure to achieve past projections," and that Ladenburg communicated this view to the Committee on January 21, and again on January 27, before doing so a third time on February 5. Third, the other reason given in the supplemental disclosure appears to be inaccurate. The supplemental disclosure referred to a conversation that took place on February 5, 2010, when the parties were discussing the Management Projections created in early January. The Updated Management Projections with "the significant increase in projected performance" were not created until February 24, 2010. Increased projections that had not yet been prepared could not have provided a reason for Danfoss to regard the original projections as "overly optimistic." The plaintiffs do not get credit for prompting the defendants to remedy an immaterial omission with an apparent misstatement.

**B. The Amount Of The Fee Award**

▮▮▮ "[T]he amount of an attorneys' fee award is within the discretion of the court." *In re Plains Res. Inc. S'holders Litig.*, 2005 WL 332811, at *3 (Del.Ch. Feb. 4, 2005). In determining an appropriate award, a court applying Delaware law should consider:

(i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation; (iii) the standing and ability of petitioning counsel; (iv) the contingent nature of the litigation; (v) the stage at which the litigation ended; (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a

portion thereof; and (vii) the size of the benefit conferred.

*Id.* at \*3 (citing *Sugarland Indus., Inc. v. Thomas,* 420 A.2d 142, 149 (Del.1980)). "This court has traditionally placed greatest weight upon the benefits achieved by the litigation." *In re Anderson Clayton S'holders Litig.,* 1988 WL 97480, at \*3 (Del.Ch. Sept. 19, 1998) (Allen, C.). In weighing that benefit, the Court must "recall that what is relevant is the benefit *achieved by the litigation,* not simply a benefit that, *post hoc ergo procter hoc,* is conferred after the litigation commences." *Id.* For this reason, "[t]he last two elements are often considered the most important." *Plains Res.,* 2005 WL 332811, at \*3. The time expended by counsel is considered as a cross-check to guard against windfalls, particularly in therapeutic benefit cases. *See Brinckerhoff,* 986 A.2d at 396.

### 1. Compensation For The Disclosure–Only Benefit

All supplemental disclosures are not equal. To quantify an appropriate fee award, this Court evaluates the qualitative importance of the disclosures obtained. Similar disclosures merit similar fee awards. *See Plains Res.,* 2005 WL 332811, at \*5 ("The court awards fees for supplemental disclosures by juxtaposing the case before it with cases in which attorneys have achieved approximately the same benefits." (internal quotation marks omitted)); *In re Dr. Pepper/Seven Up Cos. S'holders Litig.,* 1996 WL 74214, at \*5 (Del.Ch. Feb. 9, 1996) ("Fee applications in class actions resulting in nonquantifiable, nonmonetary benefits have generated decisions from this Court that provide guidance for the exercise of ... discretion."). Consistency promotes fairness by treating like cases alike and rewarding similarly situated plaintiffs equally. Establishing baseline expectations helps plaintiffs' counsel evaluate litigation opportunities and assists parties in negotiating reasonable fee awards. Recognizing the ranges developed through case-by-case adjudication—often in unreported transcript rulings—provides sister jurisdictions with helpful guidance when awarding fees in cases governed by Delaware law. Greater uniformity reduces opportunities for forum-shopping and other types of jurisdictional arbitrage, such as litigating in one court and then settling in another or presenting multiple fee applications to multiple courts.

A court can readily look to fee awards granted for similar disclosures in other transactions because enhanced disclosure is an intangible, non-quantifiable benefit. Consequently, the magnitude of the benefit does not vary with the size of the deal. Indeed, the underlying vote could involve an issue like the election of directors that lacks any explicit linkage to quantifiable value. Only for a microcap company would the Court need to consider adjusting a disclosure-only award downward to avoid a punitive result. *See Jeffrey Benison IRA v. Critical Therapeutics, Inc.,* C.A. 4039–VCL, at 61, 63 (Del.Ch. Feb. 26, 2009) (TRANSCRIPT) (considering size as factor for microcap company). Likewise the benefit does not vary with the size of the stockholder base. Whenever a plaintiff generates enhanced disclosure in connection with stockholder action, the benefit is conferred.

Recent contested fee awards in disclosure-only cases reveal a range of discretionary awards with concentrations at certain levels. This Court has often awarded fees of approximately $400,000 to $500,000 for one or two meaningful disclosures, such as previously withheld projections or undisclosed conflicts faced by fiduciaries or their advisors. *See* Appendix A. Disclosures of questionable quality have yielded

much lower awards. *See* Appendix B. Higher awards have been reserved for plaintiffs who obtained particularly significant or exceptional disclosures. *See* Appendix C.

I have focused on awards in contested cases because of the dynamics of settlement. In theory, awards should be the same for both contested and uncontested fee applications. In both scenarios, the Court has an independent duty to award a fair and reasonable fee.[4] In actuality, when reviewing an uncontested fee application, the Court suffers from an informational vacuum created when the adversity of interests that drives the common law process dissipates. As Judge Friendly pointed out nearly fifty years ago, "[o]nce a settlement is agreed, the attorneys for the plaintiff stockholders link arms with their former adversaries to defend the joint handiwork." *Alleghany Corp. v. Kirby*, 333 F.2d 327, 347 (2d Cir.1964) (Friendly, J., dissenting), *off'd per curiam*, 340 F.2d 311 (2d Cir.1965) (en banc), *cert. dismissed*, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966); *see* Jonathan R. Macey Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L.Rev. 1, 46 (1991) (describing settlement hearings as "pep rallies jointly orchestrated by plaintiffs' counsel and defense counsel").

When the requested fee is uncontested, the plaintiff frequently does not parse the benefit-to-fee relationship to a meaningful degree and often fails to provide insightful comparisons to precedent awards. Histor-ically, plaintiffs' counsel have justified agreed-upon fee awards with lengthy string cites to orders approving prior settlements, each with a fee number in parentheses. A string cite of this nature provides no information about the terms of the prior settlement, the nature of the disclosures, the efforts that merited the fee, or other pertinent factors. The supporting compendia that plaintiffs' counsel habitually file contain only copies of the orders, which themselves do not provide any of the underlying information. There is also the natural judicial tendency when reviewing an uncontested fee application that will be paid by the defendants (rather than as a deduction from a common fund otherwise distributable to the class) to defer if the amount falls within a plausible range, even if higher than what the Court might independently award. These factors warrant de-emphasizing the precedential value of uncontested fee awards, particularly when a meaningful body of contested fee award precedent exists.

Apt precedents for this case are *Triarc, BEA,* and *Brinckerhoff.* In *Triarc,* the plaintiffs sued to enjoin a controller's proposed going-private transaction priced at $18 per share. 2006 WL 903338, at *1. The board's special committee decided to recommend against the transaction, and the proposal was withdrawn in favor of a Dutch auction tender offer at $16.25 to $18.25 per share. The plaintiffs filed an amended complaint—apparently copied from a related federal action, Decl. Jonathan Hurwitz Opp. Fees ¶ 21, Triarc, C.A. 16700–NC (Del. Ch. filed Feb. 24, 2006)— that alleged disclosure violations. The

---

4. *See, e.g., Goodrich v. E.F. Hutton Gp., Inc.,* 681 A.2d 1039, 1045–46 (Del.1996) (holding that when awarding fees, the Court of Chancery "must make an independent determination of reasonableness"); *accord Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir.2002) (Posner, J.) (recognizing "the judi-cial duty to protect the members of a class in class action litigation from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class," and characterizing the judge in such cases as "a fiduciary of the class").

controller supplemented its materials to disclose that the special committee's chairman, during preliminary discussions over the previous proposal, told the controller that the committee "would seek an increase in the $18 per share proposal to a number in the low mid twenties." 2006 WL 903338, at *1. The plaintiffs sought $250,000 plus expenses; the defendants opposed any fee. Vice Chancellor Lamb awarded $75,000 in total. *Id.* at *3.

In *BEA,* the plaintiffs filed suit upon the announcement of a third-party acquisition. 2009 WL 1931641, at *1. After some wrangling over the leadership role, *see In re BEA Sys., Inc. S'holders Litig.,* 2008 WL 116338 (Del.Ch. Jan. 4, 2008), the plaintiffs filed a consolidated complaint that alleged disclosure violations. When the defendants issued their definitive proxy statement, they corrected two mistakes that the complaint identified. First, the preliminary proxy had misidentified the name of an analyst on whose work the board's investment banker relied. Elsewhere in the same paragraph, the preliminary proxy identified the analyst correctly. The definitive proxy fixed the errant reference. *See* Pls.' Br. Supp. Fees & Expenses, Ex. D at 33, Ex. E at 33, *In re BEA Sys., Inc. S'holders Litig.,* C.A. 3298–VCL (Del. Ch. filed Mar. 26, 2009). Second, the preliminary proxy mistakenly stated that a press release was issued after a certain telephonic board meeting. The definitive proxy correctly noted that the press release preceded the meeting. *See id.,* Ex. D at 23, Ex. E at 23. Plaintiffs' counsel asked for $350,000; the defendants argued against any award. Finding that "the benefit achieved in the litigation was unmistakably modest," Vice Chancellor Lamb awarded $81,297 in total. *BEA,* 2009 WL 1931641, at *1.

In *Brinckerhoff,* a plaintiff who had filed suit in Texas state court objected to a *Cox Communications* settlement in Delaware, then settled the objection for four sentences of disclosure and a promise not to oppose a fee award of up to $500,000. 986 A.2d at 396–97; *see also* TEPPCO P'rs, L.P., Schedule 14A, filed Oct. 9, 2009. The supplement reiterated two already-disclosed points and elaborated on the discount rates used in a fairness opinion. Based on the slight benefit obtained, I awarded the objector $80,000. *Id.*

This case resembles the minimally beneficial disclosures obtained in *Triarc, BEA,* and *Brinckerhoff,* I therefore start with a base range of $75,000 to $80,000.

### 2. The Time And Effort Of Counsel

The time and effort expended by counsel serves a cross-check on the reasonableness of a fee award. *See Brinckerhoff,* 986 A.2d at 396. This factor has two separate but related components: (i) time and (ii) effort.

The time (*i.e.,* hours) that counsel claim to have worked is of secondary importance. As the federal courts learned while experimenting with the lodestar method, emphasizing time encourages

> attorneys presenting fee petitions [to] engage in duplicative and unjustified work, inflate their "normal" billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may disallow. These various forms of running the meter are accompanied in a number of cases by the presence of far too many law firms submitting fee petitions.

*Court Awarded Attorney Fees: Report of the Third Circuit Task Force,* 108 F.R.D. 237, 248 (1985). This Court has observed similar practices,[5] and "[w]e have, for good reasons having to do with efficiency and incentives, resisted the tendency to make

---

5. *In re Cox Radio S'holder Litig.,* 2010 WL 1806616, at *21 (Del.Ch. May 6, 2010) (re-

hours expended in the effort a central inquiry." *In re Anderson Clayton S'holders' Litig.,* 1988 WL 97480, at *1 (Del.Ch. Sept. 19, 1988) (Allen, C.). Traditionally, we have used hours worked to calculate an effective hourly rate that can be examined to guard against windfall compensation when awarding large fees.[6] Because the precedent cases call for a low fee award in any event, I need not dwell on the hourly cross-check.

The more important aspect is effort, as in what plaintiffs' counsel actually did. When an entrepreneurial plaintiffs' firm engages in adversarial discovery, obtains documents from third parties, pursues motions to compel, and litigates merits-oriented issues, they are likely representing the interests of the class. *See* Lance P. McMillian, *The Nuisance Settlement "Problem": The Elusive Truth and a Clarifying Proposal,* 31 Am. J. Trial. Advoc. 221, 258 (2007) ("[D]oes the plaintiff put its money where its mouth is? ... [T]he willingness or unwillingness of the plaintiff to devote resources to a case provides a window into how that · plaintiff views the litigation."); *id.* at 236 n. 49 ("The longer the plaintiff litigates and the more money it invests into a case, the less likely the initial filing was motivated by nuisance intent."). By contrast, "[i]f cases are filed, sit idle for extended periods of time, and then settle or are dismissed without evidence of any action by the plaintiffs' attorneys, the claim could be made that these cases amount to little more than a sale [or an attempted sale] of a release of all potential claims in litigation." Robert B. Thompson & Randall S. Thomas. *The New Look of Shareholder Litigation: Acquisition–Oriented Class Actions,* 57 Vand. L.Rev. 133, 154 (2004).

In this case, the answer to "What did the plaintiffs do?" is "Not much." They filed fast, sat idle, then shifted into settlement mode. They conducted no adversarial discovery and obtained only the standard package of documents that defendants routinely provide to facilitate a disclosure-only settlement. Then they bargained for insubstantial disclosures. The absence of effort and the interest in settlement reinforces the appropriateness of a low award of the magnitude approved in *Triarc, BEA,* and *Brinckerhoff.*

### 3. The Relative Complexity Of The Litigation

Relative to other transaction-related litigation, this case did not present complex

---

garding the "over 1,600 hours" claimed as "excessive, especially in light of the early stage at which the litigation ended"), *aff'd,* 9 A.3d 475 (Del.2010) (TABLE); *Brinckerhoff,* 986 A.2d at 397 (rejecting counsel's claim that they "spent at least 2.760.2 hours combined in prosecuting the Texas Actions and in litigating the Objections" as "facially implausible"); *Cox Commc'ns,* 879 A.2d at 642 ("[T]he hours worked on the matter are excessive in relation to what was usefully done, involved an inefficient allocation between partners and associates, and involved work done on poorly crafted complaints and organizational infighting....").

6. *See, e.g., Franklin Balance Sheet Inv. Fund v. Crowley,* 2007 WL 2495018, at *14 (Del.Ch. Aug. 30, 2007) ("As a 'backstop check,' this Court also considers whether a contemplated fee award translates into an exorbitant hourly rate."); *Plains Res.,* 2005 WL 332811, at *6 (considering implied hourly rate "[a]s a reality check," and approving fees because result "while generous, [was] not out of line with fees awarded in the past by this court"); *In re AXA Fin., Inc.,* 2002 WL 1283674, at *7 (Del. Ch. May 22, 2002) (finding that "the implied hourly rate, while high, is not out of line with those in other cases in which plaintiffs' counsel have achieved a significant benefit to the class with only modest litigation efforts"); *Seinfeld v. Coker,* 847 A.2d 330, 338 (Del.Ch. 2000) ("In cases such as this one, ... where the percentage of the fund corresponds to more than $2,500 per hour, [the] failure [to take hourly rates into consideration] may result in a windfall.").

issues. For experienced counsel, "[c]ontrolling shareholder tender offer cases are relatively straightforward." *Cox Radio*, 2010 WL 1806616, at *21. The complexity of this case does not merit adjusting the fee relative to deal litigation precedents.

### 4. Contingency Risk

Plaintiffs' counsel technically pursued this case on a contingent basis, but "[d]isclosure claims ... are relatively safe in terms of forcing a settlement." *Id.* Because disclosure settlements are cheap and easy, and because the defendants like to use supplemental disclosures to resolve deal litigation, entrepreneurial plaintiffs' lawyers do not face significant contingency risk when challenging transactions. *See* Weiss & White, *supra*, 57 Vand. L.Rev. at 1830 ("[O]ur examination of all merger-related class actions filed in 1999–2001 suggests that the attorneys who brought these cases did not face much in the way of contingency risk."). Plaintiffs' counsel entered this case "knowing that the defendants' ability to issue supplemental disclosures and the hydraulic pressure of deal closure w[ould] combine to create a ready-made settlement opportunity." *In re Em-*

*erson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *6 (Del.Ch. Mar. 28, 2011). They started with "an obvious and well-marked exit in sight." *Id.* The disclosure precedents involved comparable levels of contingency risk, and this factor does not provide any reason to depart from precedent awards.

### 5. The Standing And Ability of Counsel

The defendants do not contest the standing and ability of plaintiffs' counsel. The plaintiffs' lawyers who brought this case regularly pursue deal litigation. The same law firms or their peers pursued many of the precedent cases. Nothing about this factor merits a departure from the precedent ranges.

## III. CONCLUSION

Delaware law recognizes the value of representative litigation.[7] This Court does not hesitate to award large fees to plaintiffs' counsel when they obtain tangible benefits.[8] This Court likewise has granted

---

**7.** *See, e.g., In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 133 (Del.Ch.1999) ("Our legal system has privatized in part the enforcement mechanism for policing fiduciaries by allowing private attorneys to bring suits on behalf of nominal shareholder plaintiffs. In so doing, corporations are safeguarded from fiduciary breaches and shareholders thereby benefit. Through the use of cost and fee shifting mechanisms, private attorneys are economically incentivized to perform this service on behalf of shareholders."); *Seinfeld*, 847 A.2d at 333 ("When shareholder plaintiffs bring meritorious lawsuits, they deter improper behavior by similarly situated directors and managers, who want to avoid the expense of being sued and the sometimes larger reputational expense of losing in court."); *Bird v. Lida, Inc.*, 681 A.2d 399, 403 (Del.Ch.1996) (Allen, C.) (explaining that entrepreneurial plaintiff lawyers, incentivized by contingent fees, can "pursue monitoring activities that

are wealth increasing for the collectivity (the corporation or the body of its shareholders)").

**8.** *See, e.g., Brinckerhoff*, 986 A.2d at 396 (awarding $10 million for $100 million benefit); *Teachers' Ret. Sys. of La. v. Greenberg*, C.A. 20106–VCS (Del. Ch. Dec. 17, 2008) (ORDER) (awarding $28 million for $115 million benefit); *Ginsburg v. Phila. Stock Exch., Inc.*, C.A. 2202–CC (Del. Ch. July 2, 2008) (ORDER) (awarding $16.6 million for $99 million benefit and incremental therapeutic relief); *La. Mun. Empls. Ret. Sys. v. Crawford*, C.A. 2635–CC (Del. Ch. June 8, 2007) (ORDER) (awarding $20 million for shared role in obtaining $3.3 billion in deal consideration and incremental disclosures); *In re Telecommunications, Inc. S'holders Litig.*, C.A. 16470–NC (Del. Ch. Feb. 1, 2007) (awarding $16.4 million for obtaining $52 million benefit).

high six- and low seven-figure fees for purely therapeutic relief, including disclosures, when the relief was meaningful.[9] At the same time, this Court strives to avoid conferring unhealthy windfalls on plaintiffs' counsel.[10] By granting minimal fees when deal litigation confers minimal benefits, this Court seeks to align counsel's interests with those of their clients and encourage entrepreneurial plaintiffs' lawyers to identify and litigate real claims.

This case does not merit a significant award. The precedents in *Triarc, BEA,* and *Brinckerhoff* support an award of $75–80,000. I award $75,000. **IT IS SO ORDERED.**

## Appendix A

| Case | Fee Award | Plaintiff's Efforts | Principal Disclosures/ Benefit |
|---|---|---|---|
| *Continuum Capital v. Nolan,* C.A. 5687–VCL (Del. Ch. Feb. 3, 2011) | $525,000 | • Three depositions (all pre-MOU) | • Management projections |
| | | • Settled without an injunction hearing | • Information about advisor's buy-side conflict<br>• Information about advisor's fee |
| *In re Burlington N. Santa Fe S'holder Litig.,* C.A. 5043–VCL (Del. Ch. Oct. 28, 2010) | $450,000 | • Three depositions (all confirmatory) | • Management projections |
| | | • Settled without an injunction hearing | • Details about negotiation process |

9. *See, e.g., Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.,* C.A. 5402–VCS (Del. Ch. Jan. 25, 2011) (ORDER) (awarding $750,000 for obtaining court-ordered disclosure of management cash-flow projections, advisor's discount rate calculation method, and discussions of management's post-deal compensation); *Henkel v. Battista,* C.A. 3419–VCN (Del. Ch. Dec. 16, 2008) (ORDER) (awarding $1,100,000 for obtaining disclosure of financial information, analysis undertaken by board and banker, and existence of other potential buyers); *V.I. Govt. Empls.' et. Sys. v. Alvarez,* C.A. 3976–VCS (Del. Ch. Dec. 2, 2008) (ORDER) (awarding $1,250,000 for obtaining disclosure of information about projections, valuation analysis, and discussions of management's post-deal compensation); *In re Lear Corp. S'holder Litig.,* C.A. 2728–VCS (Del. Ch. June 3, 2008) (ORDER) (awarding $800,000 for obtaining court-ordered disclosure of CEO's conflict of interest and major role in negotiations); *Globis Capital P'rs, LP v. Safenet, Inc.,* C.A. 2772–VCS (Del. Ch. Dec. 20, 2007) (ORDER) (awarding $1,200,000 for obtaining disclosure of bankers' analysis and bankers' book, over 100 pages of information); Richard A. Rosen, David C. McBride & Danielle Gibbs, *Settlement Agreements in Commercial Disputes: Negotiating, Drafting and Enforcement* § 27.10, at 27–84 to –85 & nn. 373–75 (2010) (discussing reasons for large disclosure-based fee awards, including fact that disclosures obtained "were particularly beneficial").

10. *San Antonio Fire & Police Pension Fund v. Bradbury,* 2010 WL 4273171, at *12 (Del.Ch. Oct. 28, 2010) ("[T]he amount of the award should incentivize stockholders (and their attorneys) to file meritorious lawsuits and prosecute such lawsuits efficiently without generating any unnecessary windfall."); *In re Nat'l City Corp. S'holders Litig.,* 2009 WL 2425389, at *5 (Del.Ch. July 31, 2009) (explaining that an appropriate fee award should "encourage plaintiffs' attorneys to remain alert in identifying and filing claims that allow courts to catch the occasional instance of overreaching board conduct" while serving "to deter frivolous lawsuits against defendants, and to avoid financial windfalls to plaintiffs' attorneys"), *aff'd,* 998 A.2d 851 (Del.2010) (TABLE); *Seinfeld,* 847 A.2d at 334 ("This Court has proceeded in the past on the unstated premise that awarding large fees will necessarily produce the incentives of encouraging meritorious suits and encouraging efficient litigation. But a point exists at which these incentives are produced, and anything above that point is a windfall.").

| | | | |
|---|---|---|---|
| *In re Zenith Nat'l Ins. Corp. S'holders Litig.*, C.A. 5296–VCL (Del. Ch. July 26,2010) | $400,000 | • Four depositions (all post-disclosures, but contested)<br><br>• Briefed and argued motion for preliminary injunction<br>• Injunction denied | • Management projections<br><br>• Details about negotiation process<br>• Details about advisor's prior work for bidder |
| *In re Wyeth S'holders Litig.*, C.A. 4329–VCN (Del. Ch. June 29, 2010) | $460,100 | • Three depositions (one pre-MOU, two confirmatory)<br><br>• Settled without an injunction hearing | • Details about management projections<br><br>• Details about negotiation process<br>• Details about contingent value right<br>• Details of advisors' methodology |
| *In re Sepracor Inc. S'holders Litig.*, C.A.4871–VCS(Del. Ch. May 21, 2010) | $550,000 | • Three depositions (two pre-MOU, one confirmatory)<br><br>• Settled without an injunction hearing | • Management projections<br><br>• Additional multiples for comparable companies analysis<br>• Precedent transaction analysis used for negotiation but not valuation |
| *IBEW Local Union 98 v. Noven Pharms. Inc.*, C.A. 4732–CC (Del. Ch. Dec. 8, 2009) | $450,000 | • Two depositions (both confirmatory)<br><br>• Filed opening brief for preliminary injunction<br>• Settled without an injunction hearing | • Management projections<br><br>• Details about negotiation process<br>• Details of fairness analysis |
| *In re Nat'l City Corp. S'holders Litig.*, 2009 WL 2425389, at *6 (Del.Ch. July 31, 2009), aff'd, 998 A.2d 851 (Del.2010) (TABLE) | $400,000 | • Three depositions (one pre-MOU, two confirmatory)<br><br>• Settled without an injunction hearing | • Details about alternative transactions<br><br>• Additional details about potential participation in TAR?<br>• Details about advisors' potential conflict |
| *N.J. Bldg. Laborers Pension and Annuity Funds v. Applebee's Int'l, Inc.*, C.A. 3124–CC (Del.Ch. Feb. 27, 2008) | $358,185 | • Four depositions (all confirmatory)<br><br>• Settled without an injunction hearing | • Management projections<br><br>• Details about advisors' potential conflict |
| *In re James River Gp., Inc. S'holders Litig.*, 2008 WL 160926 (Del.Ch. Jan. 8, 2008) | $400,000 | • Four depositions (all confirmatory)<br><br>• Settled without an injunction hearing | • Management projections<br><br>• Details of activity during the 'go-shop' period<br>• Details about advisor's prior work for bidder |
| *In re Genencor Int'l, Inc. S'holders Litig.*, C.A. 1052–N (Del. Ch. June 2, 2005) | $450,000 | • Five depositions (all pre-MOU)<br><br>• Filed opening brief for preliminary injunction<br>• Settled without an injunction hearing | • Disclosure of advisor's fee<br><br>• Details about negotiations<br><br>• Confirmed that advisor did not place any value on subsidiary |
| *In re Cardiac Sci., Inc. S'holders Litig.*, C.A. 1138–N (Del. Ch. Jan. 4, 2005) | $300,000 | • Five depositions (all pre-MOU)<br><br>• Filed opening brief for preliminary injunction<br>• Settled without an injunction hearing | • Details of negotiation process<br><br>• Details on value of certain assets<br>• Additional details on CEO's interest in merger |

## Appendix B

| Case | Fee Award | Plaintiffs Efforts | Principal Disclosures/ Benefit |
|---|---|---|---|
| *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370 (Del. Ch.2010) | $ 80,000 | • Sent pre-suit letter to board<br>• Filed complaint in Texas<br>• Moved to compel discovery about settlement negotiations | • Details of discount rates used in fairness opinion<br>• Objected to Cox Communications settlement |
| *In re BEA Sys., Inc. S'holders Litig.*, 2009 WL 1931641 (Del.Ch. June 24, 2009) | $ 81,297 | • Supplemental disclosure made before preliminary injunction briefing, hearing, and discovery<br>• Injunction denied | • Corrected typographical error<br>• Corrected sequence of events regarding timing of press release |
| *Jeffrey Benison IRA v. Critical Therapeutics, Inc.*, C.A. 4039–VCL (Feb. 26, 2009) | $175,000 | • Two depositions (both confirmatory)<br>• Settled without an injunction hearing | • Details on value of merger consideration<br>• Buyer's management projections of buyer's standalone earnings, as adjusted by target's management |
| *Augenbaum v. Forman*, 2006 WL 1716916 (Del.Ch. June 21, 2006) | $225,000 | • Three depositions (all confirmatory)<br>• Settled without an injunction hearing | • Details of negotiation process<br>• Details of advisor's previous work for buyer |
| *In re Triarc Cos. S'holders Litig.*, 2006 WL 903338 (Del.Ch. Mar. 29, 2006) | $ 75,000 | 75 None beyond filing of complaint and amended complaint | • Fact that chairman of special committee thought deal price was inadequate |

## Appendix C

| Case | Fee Award | Plaintiff's Efforts | Principal Disclosures/ Benefit |
|---|---|---|---|
| *In re Lear Corp. S'holder Litig.*, C.A. 2728–VCS (Del. Ch. June 3, 2008) | $ 800,000 | • Ten offensive depositions and two defensive depositions<br>• Full briefing and argument on application for preliminary injunction<br>• Preliminary injunction granted | • Information about CEO's conflict of interest<br>• Information about CEO's role in negotiations and sale process |
| *Globis Capital P'rs, LP v. SafeNet, Inc.*, C.A. 2772–VCS (Del. Ch. Dec. 20, 2007) | $1,200,000 | • Four depositions (all pre-MOU)<br>• Full briefing and argument on application for preliminary injunction<br>• Settled after injunction hearing | • Extensive, detailed descriptions of bankers' fairness opinions and underlying analyses<br>• Two complete bankers' books<br>• More than 100 pages of disclosure |