Kaplan, Mitchell H., J.
INTRODUCTION
This action arises out of Asahi Corporation’s (Asahi)[2] acquisition of Zoll Medical Corporation (Zoll), a corporation organized under the laws of Massachusetts. On March 12, 2012, Zoll and Asahi jointly announced a definitive merger agreement (the Merger Agreement) pursuant to which Asahi would acquire the shares of Zoll through a cash tender offer (the Offer) followed by a short form merger of Zoll into an Asahi subsidiary. Shortly after the proposed merger was announced, four putative class action complaints were filed challenging the share price and the process that led to the Merger Agreement and the adequacy of Zoll’s disclosures concerning the Offer and contemplated merger.[3] The plaintiffs are all holders of Zoll’s common stock and the defendants are Zoll and its directors, Asahi, and Asahi’s subsidiaries involved in the proposed Offer and merger. After discussions between the parties, the four actions were dismissed and refiled as a consolidated action in this court and then settled, subject to court approval, twenty-nine days after the first of the four actions was filed. More than ninety percent of the outstanding shares of Zoll were tendered, and the merger was completed in the manner contemplated in the Merger Agreement. On February 14, 2013, following notice to members of the class, a hearing was convened on the plaintiffs’ motion for the certification of a non-opt-out class—for settlement purposed only—and approval of the settlement. The defendants supported that motion. Plaintiffs and defendants did not, however, agree on an amount of attorneys fees that plaintiffs would ask the court to award plaintiffs’ counsel and Asahi to pay, nor did the defendants agree not to oppose plaintiffs’ fee request. The case is therefore before the court in the somewhat unusual posture, for this court, of a fully litigated attorneys fees request.
ADDITIONAL BACKGROUND
On March 26, 2012, Zoll filed its Schedulel4D-9 (the Schedule) with the Securities and Exchange Commission and made it available on its web site. The Schedule explained that Asahi was offering to purchase all of the outstanding shares of Zoll for $93 a share and that the Offer was scheduled to expire at the end of Friday, April 20, 2012, subject to a right to extend the Offer under certain circumstances and consistent with applicable law. $93 represented a premium of 29.6% over the weighted average closing price of Zoll’s stock during the 30 trading days preceding March 12, 2012, the day the Offer was announced. The Schedule also disclosed that, at a March 11, 2012 meeting, the Zoll Board of Directors (the Board) determined that the Offer and the related transactions were in the best interest of Zoll and its shareholders and authorized Zoll to enter into the Merger Agreement. The Schedule included as an attachment a letter to Zoll shareholders from defendant Richard Packer, Chief Executive Officer of Zoll, in which he advised shareholders that the Board unanimously recommended the Offer.
The Schedule described, among other things: the historic relationship that existed between Zoll and Asahi and the events and negotiations leading up to the execution of the Merger Agreement; the process that led to the Board’s selection of Brown Brothers Harriman & Co (BBH) as Zoll’s financial advisor and a description of BBH’s analysis of the fairness of the proposed transaction; and the Board’s consideration of whether initiating a competitive bidding process for Zoll was advisable under the circumstances; and the limited market-check approach that the Board directed BBH to conduct prior to concluding its negotiations with Asahi and signing the Merger Agreement.
On April 12, 2012, the defendants reached an agreement in principle with counsel to the plaintiffs to settle this consolidated action, subject to final approval by this court (the Settlement Agreement). The Settlement Agreement called for additional disclosures concerning: communications between Zoll and Asahi; BBH’s communications with three companies contacted by BBH to determine if they had any interest in acquiring Zoll; how BBN performed its discounted cash flow valuation of Zoll; and shareholders’ potential appraisal rights, if they rejected the Offer. These additional disclosures were set out in an amended Schedule filed with the SEC on April 13, 2012.
By the end of the initial Offer period, 20,916,921 shares had been tendered and not withdrawn. This represented 93.82% of the issued and outstanding shares; but included 3,088,887 tendered by notice of guaranteed delivery. The Offer was extended to April 25, 2012, by which date 20,745,382 shares were validly tendered (some of the guaranteed delivery shares were not ultimately tendered), which amounted to 93.05% of issued and outstanding shares. The merger was then completed in the manner contemplated by the Merger Agreement.
In addition to seeking certification of a class of Zoll shareholders for settlement purposes and approval of the settlement, plaintiffs have moved for an award of attorneys fees in the amount of $1,906,000. Plaintiffs break that sum down into two components: $450,000 for the additional disclosures set out in the amended *481 Schedule other than that relating to appraisal rights and $1,456,000 for Zoll’s concession regarding such rights.
DISCUSSION
The defendants do not contend that the plaintiffs’ attorneys efforts in this case provided no benefit to the Zoll shareholders, but maintain that the benefit was very modest and suggest that an award of $80,000 would be appropriate. Plaintiffs, in turn, submitted affidavits that collectively attest that the work performed by the six law firms that represented plaintiffs generated a lodestar of $381,207 and expenses of $25,859.50. Plaintiffs, however, assert that the result they achieved for the Zoll shareholders warrants a significant multiplier of the lodestar and request the award of fees and expenses noted above.
The plaintiffs argue at length that since the settlement provides for a broad release of all claims that the former Zoll shareholders might have against the defendants (and an extensive array of other associated “Released Parties”) relating to the Offer and the merger, the settlement must have provided great value to the class members—otherwise the settlement would be ’’illusory." Stated differently, the court understands this argument to be that the court could not find that the settlement was fair, adequate and reasonable to the members of the class without also implicitly finding that it was of sufficient benefit to support an award of substantial attorneys fees. The court does not find this argument convincing or consistent with the decisions of other Massachusetts Superior Courts or Delaware courts.
Weak claims asserted by shareholder plaintiffs in connection with corporate transactions of the kind at issue here, especially those in which discovery fails to identify significant facts that were not disclosed to shareholders, will give rise to modest awards of attorneys fees both in Massachusetts and Delaware courts. See, e.g., Massachusetts Superior Court cases Lorenzi v. Haydu, CA No. 09-4226-BLS1 (March 25, 2010), and Albright v. Leuchtenberger, CA No. 09-269-BLS2 (August 6, 2009), and Delaware cases cited in In re Sauer-Danfoss Inc. Shareholders Litigation, 2011 WL 2519210 at *15 (Del. Ch.) (May 3, 2011) (in which cases the Chancery Court awarded fees in the $80,000 range). Indeed, to hold otherwise would require defendants to litigate all weak claims to judgment, if they were unwilling to accede to plaintiffs’ demands for substantial attorneys fees. In Massachusetts, the Supreme Judicial Court has advised that: “When determining a reasonable attorneys fee, the focus is ... the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area and the amount of awards in similar cases.” Berman v. Linnane, 434 Mass. 301, 303 (2001) (internal quotations and citations omitted). Certainly, in shareholder litigation where the efforts of plaintiffs’ counsel generate a significant common fund that all class members enjoy and/or substantial other benefits to a class of shareholders, that “favorable result” should weigh heavily in determining the appropriate fee award, including a significant lodestar multiplier. See In re Arnicas, Inc. Shareholder Litigation, 27 Mass. L. Rptr. 568 (Dec. 6, 2010). By the same token, minimal benefits to the class ought to result in only modest awards. In cases such as the present one, it is therefore necessary to consider, as best the court can, the value of the additional disclosures[4] or other benefits conferred on the class through plaintiffs’ counsels’ efforts.
THE DISCLOSURES
The Relationship Between Zoll and Asahi
The Schedule provides a description of the communications between Zoll and Asahi during the period November 2010 to the Board’s decision to enter into the Merger Agreement. In particular, it describes the manner in which discussions concerning a distribution agreement between Zoll and Asahi led to an agreement pursuant to which Asahi would distribute and market most of Zoll’s products in Japan, then to Asahi’s offer to invest in Zoll, and eventually to acquire Zoll. The Schedule disclosed that between November 2010 and the end of 2011, Asahi “acquired 98.44% of ADMIS, a third-party company that was [Zoll’s] authorized quality and regulatory representative in Japan.” As a result of the Settlement Agreement, Zoll made the following additional disclosure immediately after the quoted sentence: “[Zoll] informed [Asahi] that if [Asahi] acquired ADMIS, [Zoll] would likely seek an alternative authorized quality and regulatory representative in Japan to avoid being captive to its distributor.” While this is additional information, its value to shareholders evaluating the Offer is not immediately apparent. Notwithstanding the distribution and marketing alliance that Zoll and Asahi had entered into, if the parties had not come to an agreement on the terms of a merger, perhaps Zoll would have decided that it was advisable to have an independent regulatory ad-visor in Japan. The fact that Zoll did not seek out another advisor while negotiating first an alliance and then a merger does not seem very significant. This disclosure adds only modestly to the mix of information already disclosed.
The Board’s Determination that It Was Independent
The Schedule disclosed that on January 17, 2012, the Board met with its attorneys, Goodwin Procter, and financial advisor, BBH, to discuss Asahi’s January 10th offer of $86 a share. At that meeting, “Goodwin Procter reviewed the Board’s fiduciary duties in connection with a potential sale of the Company.” The following disclosures concerning that meeting were added pursuant to the Settlement Agreement: “The Board also considered whether to establish a special *482 transaction committee in order to assist [Zoll] and its advisors in evaluating the January 10 Proposal and exploring a potential sale transaction. The Board determined, with assistance from Goodwin Procter, that the January 10 Proposal did not contain terms that could reasonably be viewed as creating or leading to actual or potential conflicts of interest for any of the directors and that an independent special committee was therefore not necessary.”
Implicit in the already existing disclosures was the Board’s determination that a special committee was not required, as none is mentioned in the lengthy description of the Board’s consideration of Asahi’s proposals. This additional disclosure that the Board specifically discussed this issue with Zofl’s attorneys (as part of the discussion of the Board’s fiduciary duties in connection with a potential sale of the company) makes express that which was implicit. A disclosure of a board’s determination that no conflict of interest existed, in the absence of the discovery of a conflict, is certainly not as valuable as a disclosure to shareholders of a conflict that might not have been apparent and could affect a shareholder’s view of the fairness of the transaction.
The Market Check Process
The Schedule discloses a quite abbreviated market check process. It describes Asahi’s unwillingness to engage in a competitive bidding process and rejection of “go shop” provisions in the Merger Agreement. In the end, the Board identified only three companies that it would contact before signing the Merger Agreement to inquire if they were interested in pursuing an acquisition of Zoll. It directed BBH to contact these companies “to ascertain their interest in a potential business combination transaction . . . and requested that the parties respond to BBH on or prior to March 7, 2012.’’The Schedule also disclosed that one of these companies indicated its lack of interest on March 1 and another on March 5. The third had not responded at all by March 7 and was therefore presumed not to be interested. The Settlement Agreement added two additional disclosures: (i) “Representatives of BBH also indicated to each of [the three companies] that [Zoll] was in advanced discussions regarding a potential business combination transaction with another party”; and (ii) “after considering [the three companies] failed to express an indication to proceed further with the process, the Board, based on considerations discussed at prior meetings, determined that it was in the best interest of the shareholders to pursue a potential transaction with [Asahi].”
The first of these two disclosures may have value in that it provides even further evidence that the “market check” was relatively weak. Each of these three companies were not only given a brief time in which to consider whether it wanted to pursue a complex transaction with Zoll, each was also told that another company was already well along in negotiating such a transaction. As to the second disclosure, again it makes express that which is implicit. The Schedule disclosed the response, or lack of response from, each of three companies queried by BBH. The existing disclosures certainly strongly suggested that, after learning that none of the three companies was interested in a transaction with Zoll, the Board turned its attention to finalizing a deal with Asahi.
BBH’s Discounted Cash Flow Calculations
The Schedule includes a summary of Zofl’s previously non-public financial forecasts of future operations that were provided to Asahi in connection with its due diligence review. It also includes the data that BBH used and the calculations that it undertook with reference to these forecasts to arrive at its fairness opinion. One of these calculations arrived at an enterprise value for Zoll, and related per share values, based on a discounted cash flow analysis. The additional information provided under the Settlement Agreement included a description of the formula that BBH applied to the forecast operations in connection with this calculation: “Unlevered free cash flow was calculated as earnings before interest and taxes plus depreciation and amortization less cash taxes, changes in net working capital and capital expenditures.” That was additional information, although at the hearing on this motion counsel for plaintiffs acknowledged that there was nothing unusual about this approach.
The Schedule stated that present values were determined using discount rates ranging from “9.5% to 10.5%, reflecting estimates of [Zofl’s] weighted average cost of capital using the capital asset pricing model.” The Settlement Agreement called for the following phrase to be added to the end of that sentence: “and market data relating to the companies included in BBH’s Selected Companies Analysis.” Again that is a little more information, and perhaps useful to shareholders doing a detailed analysis of BBH’s opinion, but after the discount rates used to arrive at present values are disclosed, this additional disclosure does not appear to be critical information for a shareholder in considering the weight to be given to BBH’s analysis. It would appear that the critical information includes: Zofl’s financial forecasts, the comparable companies BBH selected, and the multiples or discount rates used to arrive at enterprise value under the different valuation approaches that BBH employed. See Ehrlich v. Phase Forward Inc., 80 Mass.App.Ct. at 684 (“By setting forth a fair summary of the valuation work [BBH] in fact performed, the board met its obligation under our law[,]" citing, In re JCC Holding Co. Shareholders Litigation, 843A.2d713, 7222 (Del. Ch. 2003)).
In summary, some of the additional disclosures added to the Schedule as a result of the Settlement Agreement were helpful to shareholders, but none revealed a significant fact not previously disclosed that materially altered the mix of information already pro *483 vided. See id. at 682 (“Materiality of information in this context has been defined as a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal citations and quotations omitted)).
APPRAISAL RIGHTS
The Schedule explained Zoll management’s view that, under G.L.c. 156D, §13.02(a)(1), shareholders that did not tender their shares and still held them at the time of the merger may not be entitled to appraisal rights, as this transaction was covered by the exception to the general rule that mergers give rise to such rights: the shareholders were receiving cash for their shares and no officer or director of either company has a special financial interest. The Schedule observed that the Massachusetts courts had not yet construed this provision of the Massachusetts Business Corporations Act (MBCA), and “it is possible that a court could conclude that this exception is not applicable and that [Zoll’s] shareholders are entitled to appraisal rights under Massachusetts law.” Pursuant to the Settlement Agreement, the amended Schedule added the following statement to the sentence quoted above: “as part of the settlement of litigation challenging the Offer and the Merger . . ., [Zoll] has agreed that in any proceeding by an individual shareholder pursuant to Section 13.02, the Company will not assert as a defense that this exception applies to the Merger. As discussed above, however, Section 13.02 has not been the subject of judicial interpretation in these circumstances and it is possible that the court will determine that the exception applies and that the Company’s shareholders are not entitled to appraisal rights under Massachusetts law notwithstanding the Company’s agreement referred to above.”
Quite frankly, the court does not understand what this additional statement is intended to convey. Plaintiffs argue that Zoll (and after the merger, Asahi) agreed that appraisal rights exist for shareholders who do not tender their shares and perfect their rights in the manner required by the MBCA. They direct the court to §13.02(a)(6) which provides that shareholders are entitled to appraisal rights in the event of “any corporate action taken pursuant to a shareholder vote to the extent... a resolution of the board of directors provides that voting or nonvoting shareholders are entitled to appraisal.” There is no suggestion in the record that such a resolution exists. To the contrary, Zoll explicitly did not agree that appraisal rights exists for non-tendering shareholders; rather, the amended Schedule expressly states that a court might still find that in the context of this merger, Zoll shareholders have no right to seek appraisal, notwithstanding Zoll’s agreement not to raise this issue. In other words, Zoll agreed not to defend an appraisal action by bringing to the attention of the court the fact that this merger falls within the exception set out in §13.02(a)(1); but warning shareholders that the court might nonetheless figure that out for itself.
On the other hand, it should be noted that under §13.30, if a shareholder made demand for payment of shares and the demand remained unsettled, it is Zoll that must commence a proceeding by petitioning a court to determine the fair value of all shares as to which shareholders have properly demanded payment.[5] If Zoll is precluded from raising the issue of the exception and simply files an action asking the court to determine fair value, how would the court even know that the merger falls within the exception? Quite frankly the court finds the language in the amended Schedule too clever by half. If the parties agreed that non-tendering shareholders shall have appraisal rights under §13, that should be clearly stated. If the intention was to craft a statement that might or might not be of any benefit to shareholders, or that was purposely ambiguous leaving a court to sort out its meaning, without the benefit of the adversary process, it had no place in the amended Schedule.
Assuming, arguendo, that non-tendering shareholders have appraisal rights, what value, if any, does the grant of appraisal rights provide to the class of shareholders? The plaintiffs analogize their obtaining appraisal rights for individual, non-tendering shareholders to the injunction that the plaintiffs achieved in the Delmonte Shareholders Litigation which delayed a merger vote for twenty days and enjoined enforcement of no-shop, match right and termination fee provisions in the Merger Agreement, enabling the opportunity for a third-party to make a topping bid for the company.[6] The court does not see the analogy. Such a topping bid would, have provided a benefit to all class members. In the instant case, even if the current bid is “fair,” there is, for example, the possibility that a third party would see particular synergies from an acquisition making the transaction of unique value to it and make a topping bid if deal protection provisions were removed. Appraisal rights must be asserted individually by shareholders. The fact that no shareholder sought to take advantage of these appraisal rights, including the named plaintiffs on whose behalf they were negotiated, is at least suggestive of the value of these rights.
Furthermore, in the case of appraisal rights, the right created can be exercised by any shareholder who thinks that an appraisal proceeding will produce greater value for its shares. Indeed, the existence of appraisal rights might logically decrease the likelihood of a topping bid, as they could increase the potential costs of the transaction to the acquirer. Logically, the value of negotiating appraisal rights would be that the acquirer would raise its offer for fear that it would be at risk that many shareholders would take advantage of these rights and become entitled to court ordered compensation of an even greater amount than the increased offer. In this case, the willingness to grant *484 appraisal rights could be seen as reflective of Asahi’s comfort that it had offered a fair price
Moreover, in Del Monte, the court considered the value to shareholders of creating the opportunity for a third-party bid, even if none appeared, and did so based on academic research concerning the frequency with which third-party bids appeared in going private transactions when they included a “go-shop” provision. This court finds no correlation between the Delaware court’s analysis of the likelihood of third-party offers under such circumstances and the likelihood that shareholders would successfully take advantage of appraisal rights.[7]
Moreover, in this case, the plaintiffs argue that the value of the appraisal rights should be measured by the fact that, after the Offer was announced, one of the market analysts who followed Zoll suggested that its stock still had a target price of $100. However, plaintiffs offered no reasoned explanation as to why this analyst’s views were sound and better informed than the other firms that covered Zoll. Indeed, a review of this analyst’s March 19, 2012 report finds it to be full of speculation concerning Zoll’s products. The report ends with the question: “Any takers?” To which the answer was “no.” The fact that an analyst suggested a target price of $100 a share is simply not evidence of the likely outcome of an appraisal proceeding where the court is asked to find the fair value of shares, especially where arms’ length negotiations between a willing buyer and seller had already occurred.
THE AWARD OF ATTORNEYS FEES
The affidavits submitted in support of the lodestar amount identify the lawyers and firms that worked on the case and the number of hours expended, but not the services performed. This case was litigated for approximately four weeks. There was no motion practice. Documents were exchanged voluntarily. Plaintiffs took two depositions and defended one. The number of lawyers engaged on behalf of the plaintiffs seems to have been more a function of the number of cases originally filed than the number of lawyers necessary to perform the work. The court appreciates the plaintiffs’ willingness to consolidate their cases, but that does not mean that multiple attorneys from every firm were required to litigate this brief case. The court finds the lodestar to be excessive.
The court also finds that none of the disclosures added by the Settlement Agreement included noteworthy new information that would have materially changed a shareholder’s analysis of the Offer; although, some of the disclosures would have helped flesh-out the limited nature of the market check and provided some additional insight into BBH’s analysis. The court awards $ 150,000 in respect of the additional disclosures.
The courtis at a loss to evaluate the benefits of Zoll’s willingness not to assert as a defense that the MBCA does not provide appraisal rights for the type of transaction at issue here. Nonetheless, Zoll agreed not to assert this defense and to explain its position in the amended Schedule. The court assumes that Zoll would not have added language to its disclosure in this regard if its agreement and disclosure of it had no value to its shareholders. The court awards $125,000 in respect of the appraisal rights issue.
The court awards costs and expenses in the amount requested and permits payment to plaintiff Rodriguez of an amount not to exceed $5,000 from the attorneys fees awarded as an incentive award to him.
ORDER
For the foregoing reasons, the plaintiffs are awarded $275,000 in attorneys fees and $25,859.50 in costs and expenses to be paid in accordance with the parties’ stipulation of settlement.

he acquisition was accomplished through an indirect subsidiary of Asahi, a Japanese corporation, but it is not necessary to distinguish between Asahi and its subsidiaries for the purposes of this memorandum.

Nhe first of these actions was filed on March 15, 2012.

“A11 supplemental disclosures are not equal. To quantify an appropriate fee award this Court evaluates the qualitative importance of the disclosures obtained.” Sauer-Danfoss, supra, at 14. See, also, In re Del Monte Foods Company Shareholders Litigation, 2011 WL 2535256 *8 (Del.Ch.) (discussing fee awards of $400,000 to $500,000 “for one or two meaningful disclosures, such as previously withheld projections or undisclosed conflicts faced by fiduciaries or then-advisors. Disclosures of questionable qualify have yielded much lower awards”).

“If a shareholder makes demand for payment under section 13.26 which remains unsettled, the corporation shall commence an equitable proceeding within 60 days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest.” See §13.30(a).

See fn 4, supra.

As to transactions like the one at issue in this case, the comments to §13.02 state, in relevant part:
The traditional rationale for application of these rights does not apply: the shareholder needs no statutorily-given right to exit because all shareholders are similarly exiting, by receiving cash . . . Nor does an additional safeguard with respect to fairness seem to be necessary: the vote of the necessary percentage of shareholders approving the transaction and the fact that the controlling party— whether external or internal—has found the terms of the transaction acceptable offer substantial safeguards as to fairness.
Creating the opportunity for a topping bid is very different than the statutory right to cash out at a fair price.