# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MATTHEW SCIABACUCCHI, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0931-JTL |
| MATTHEW B. SALZBERG, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, BRIAN P. KELLEY, KATRINA LAKE, STEVEN ANDERSON, J. WILLIAM GURLEY, MARKA HANSEN, SHARON MCCOLLAM, ANTHONY WOOD, RAVI AHUJA, SHAWN CAROLAN, JEFFREY HASTINGS, ALAN HENDRICKS, NEIL HUNT, DANIEL LEFF, and RAY ROTHROCK, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| BLUE APRON HOLDINGS, INC., STITCH FIX, INC., and ROKU, INC., | ) ) ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 30, 2019
Date Decided: July 8, 2019

Kurt M. Heyman, Melissa N. Donimirski, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jason M. Leviton, Joel A. Fleming, BLOCK & LEVITON LLP, Boston, Massachusetts; *Counsel for Plaintiff.*

William B. Chandler III, Randy J. Holland, Bradley D. Sorrels, Lindsay Kwoka Faccenda, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Boris Feldman, David J. Berger, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Counsel for Defendants Katrina Lake, Steven Anderson, J. William Gurley, Marka Hansen, Sharon McCollam, Anthony Wood, Ravi Ahuja, Shawn Carolan, Jeffrey Hastings, Alan Hendricks, Neil Hunt, Daniel Leff, Ray Rothrock, and Nominal Defendants Stitch Fix, Inc. and Roku, Inc.*

Catherine G. Dearlove, Sarah T. Andrade, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael G. Bongiorno, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York; Timothy J. Perla, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts; *Counsel for Defendants Matthew B. Salzberg, Julie M.B. Bradley, Tracy Britt Cool, Kenneth A. Fox, Robert P. Goodman, Gary R. Hirshberg, and Brian P. Kelley, and Nominal Defendant Blue Apron Holdings, Inc.*

**LASTER, V.C.**

Before their initial public offerings, the three nominal defendants adopted provisions in their certificates of incorporation that required any claim under the Securities Act of 1933 to be filed in federal court (the "Federal Forum Provisions"). The plaintiff challenged the validity of the provisions, and the parties cross-moved for summary judgment. This court held that the provisions are ineffective (the "Merits Decision"). *See Sciabacucchi v. Salzberg*, 2018 WL 6719718 (Del. Ch. Dec. 19, 2018).

Relying on the benefit conferred by the Merits Decision, the plaintiff applied for an all-in award of attorneys' fees and expenses in the amount of $3 million. The defendants opposed the award, arguing that the plaintiff should receive at most $364,723 plus expenses.

The controlling authority governing fee awards is *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del. 1980). In that decision, the Delaware Supreme Court identified factors for this court to consider when determining a reasonable fee. *See id.* at 149–50. More recently, the Delaware Supreme Court has summarized the relevant factors concisely: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

"In determining the size of an award of attorney's fees, courts assign the greatest weight to the benefit achieved by the litigation." *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *8 (Del. Ch. Aug. 30, 2007). "Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature

of the fee arrangement together with the level of contingency risk actually involved in the case." *Olson v. ev3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011). "Hours worked are considered as a crosscheck to guard against windfall awards, particularly in therapeutic benefit cases." *Id.*

If the benefit is quantifiable, then "*Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit." *Ams. Mining*, 51 A.3d at 1259. The *Americas Mining* decision provided guideline ranges for this court to consider when awarding fees. *Id.* at 1259–60. Selecting an appropriate percentage requires an exercise of judicial discretion, but the use of guideline ranges helps promote consistent awards so that similar cases are treated similarly. *See id.* at 1261.

In cases where the value of the benefit is not easily quantified, this court often looks to "[p]recedent awards from similar cases." *Olson*, 2011 WL 704409, at *8. Like the use of guideline ranges, reliance on precedent promotes fairness and fulfills the equitable principle that "like cases should be treated alike."[1]

---

[1] *Id.*; *see In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1136 (Del. Ch. 2011) (looking to precedent awards when ruling on fee application for disclosure-based benefits because "[s]imilar disclosures merit similar awards"); *In re Plains Res. Inc. S'holders Litig.*, 2005 WL 332811, at *5 (Del. Ch. Feb. 4, 2005) ("The court awards fees for supplemental disclosures by juxtaposing the case before it with cases in which attorneys have achieved approximately the same benefits." (alteration and internal quotation marks omitted)); *In re Golden State Bancorp Inc. S'holders Litig.*, 2000 WL 62964, at *3 (Del. Ch. Jan. 7, 2000) (explaining that when awarding fees for benefits that are "nonquantifiable [and] nonmonetary," the court looks to "cases in which attorneys have achieved approximately the same benefits"); *In re Dr. Pepper/Seven Up Cos., Inc. S'holders Litig.*, 1996 WL 74214, at *5 (Del. Ch. Feb. 9, 1996) ("Fee applications in class actions resulting

### 1. The Results Achieved

In this case, the plaintiff achieved a significant and substantive result by successfully invalidating the Federal Forum Provisions. Because the value of the relief is non-quantifiable, the plaintiff looked to precedent to determine an appropriate fee. He found an analogous case in the litigation that generated the principal authority on which the Merits Decision relied: *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934 (Del. Ch. 2013). The plaintiffs in the *Boilermakers* litigation and their affiliates initially sued eleven different companies that had adopted bylaw provisions that selected the courts of the State of Delaware as the exclusive forum for internal-affairs claims. They also sued four other companies that had proposed to adopt comparable provisions in their certificates of incorporation.

After the plaintiffs filed suit, nine of the companies that had adopted bylaw provisions voluntarily eliminated them. The four companies that had proposed to adopt charter-based provisions voluntarily withdrew their proposals. Two of the companies that had adopted exclusive-forum bylaws stood by their provisions, and the litigation over those provisions eventually generated the *Boilermakers* decision.

By voluntarily withdrawing their provisions and proposals, the other thirteen companies mooted the plaintiffs' challenges and provided the plaintiffs with a basis to seek a fee award. The plaintiffs approached the companies to discuss an aggregate award, and

---

in nonquantifiable, nonmonetary benefits have generated decisions from this Court that provide guidance for the exercise of . . . discretion.").

3

six of the defendants made a joint offer back to the plaintiffs. *See In re Exclusive Forum Provision Mootness Fee Petitions* (*Exclusive Forum*), Consol. C.A. No. 7216-CS, at 17–18 (Del. Ch. May 29, 2012) (TRANSCRIPT). After further discussion, defense counsel asked the plaintiffs to reframe their request as a per-company figure. *See id.* at 56.

The settlement discussions eventually broke down, and the plaintiffs filed a fee petition against each company. In their petitions, the plaintiffs requested an award of $400,000 for each company that had withdrawn a bylaw, for a total award of $3.6 million from those defendants. The plaintiffs requested $500,000 for each company that had withdrawn a charter provision, for a total award of $2 million from those defendants. *See id.* at 56–57. The petitions were later consolidated into a single proceeding.

Chief Justice Strine, then serving as Chancellor, convened an office conference to discuss the petitions. The bulk of the conference focused on the plaintiffs' request for a total of $3.6 million from the nine defendants who had withdrawn their bylaw provisions. *See Exclusive Forum*, Consol. C.A. No. 7216-CS, at 34, 56–57. Then-Chancellor Strine described this figure as "nothing at all shocking" and something that did not "strike [him] as absurd when you think about it globally." *Id.* at 31, 37. He pointed out that the plaintiffs had taken on "a hotly contested, open issue" and that the defendants "gave them their victory." *Id.* at 11, 13; *see id.* at 59.

The Chancellor also explained that the plaintiffs' request appeared reasonable when judged against fee awards in other therapeutic benefit situations:

Here, let's not pretend -- there's one simple reason why the defendants themselves can't say that this is an insubstantial issue. It's because their own

4

clients chose to make it a bylaw; right? So there's a certain dignity to a bylaw. These were adopted for some good and sufficient purposes.

\* \* \*

When I'm looking at defense counsel who I think very highly of, who have sat mutely in court . . . . in [hearings over weak disclosure settlements] and not opposed fees that even go into the seven figures; the idea that you're sitting here and . . . let's just say I awarded 400 for every case. Would that be shocking? Really?

In comparison to the disclosure-only settlements that have been brought to me by the same folks over the years? Just to get rid of an actual bylaw that deals with where plaintiffs who own stock can sue the directors of the corporation. Now, again, wise or unwise, seems to me a fairly substantive bylaw. . . . This is a very sensitive subject for our state. It's a very sensitive subject for our nation in terms of dealing with representative litigation, and it needs to be dealt with in a serious and proportionate way.

*Id.* at 20–22 (formatting added). Then-Chancellor Strine later observed that if the parties had settled and asked him to approve an aggregate fee of $3.6 million as part of the settlement, he could "approve this with far less agita and interruption in my sleep than many settlements I've ultimately approved . . . ." *Id.* at 37.

Towards the end of the conference, one of the lawyers who represented a defendant that had proposed a charter-based provision advised the Chancellor about those four cases, for which the plaintiffs sought an additional $2 million. *See id.* at 55–56, 61–62. The Chancellor instructed all defense counsel to remain after the office conference and reach a common position, then negotiate with the plaintiffs. He offered the following guidance:

The plaintiffs ought to be willing to come off their number. Even if it's their preferred number, they ought to be willing to come off their number some to just get it for sure done. I'm not saying they should come off it in big ways because, again, I'm not looking at their number as a crazy number. I'm just telling you off hand. It is not crazy. How you get . . . from 4 to 5 because it's a certificate case . . . , I don't know that that's perfect. That's the sort of thing

5

> I would say to plaintiffs, if everybody is at 4, I wouldn't blow it up over that
> . . . .
>
> But if all the defendants are at 75,000, again, I should bring the people from Planters here, because that is more consistent with what I would understand to be the party mix number than, you know, a reasoned, prudent assessment of the likely outcome of something based on Delaware law.

*Id.* at 64. With thirteen defendants, "if everybody [was] at 4," then the total award would have been $5.2 million. The "party mix number" would have resulted in a total award of $975,000. The Chancellor warned the defendants that "there's a real likelihood you could come out of something like this with 5.2 [million]." *Id.* at 65.

Shortly thereafter, the fee petitions were resolved. Although complete information about the fee paid by each defendant is not available, the nine defendants who had withdrawn their bylaw provisions paid $333,333 each, for a total award of roughly $3 million. If the four defendants with charter-based provisions also paid $333,333 each, as seems likely, then the total award in the *Exclusive Forum* case exceeded $4.3 million.

Based on the *Exclusive Forum* award, the plaintiff in this case seeks $3 million. He argues that the total fees received by plaintiffs' counsel in the *Exclusive Forum* litigation reflected the significance of the result they achieved and should not be discounted by the number of companies involved.

The defendants disagree. Rather than looking to the *Exclusive Forum* award, they argue for an award based on *quantum meruit*. To the extent this court looks to the *Exclusive Forum* award, they believe the court should interpret it as supporting, at most, an award of $333,333 per company.

6

The *Exclusive Forum* award provides an apt precedent for sizing the value of the benefit conferred in this case. At a conceptual level, the result achieved here matches what the *Exclusive Forum* plaintiffs accomplished: the removal of forum-limiting provisions from the governing documents of the nominal defendant corporations. Having yielded the same result, the cases warrant comparably sized awards. Viewed practically, however, the plaintiff in this case achieved something more significant. Each of the *Exclusive Forum* defendants removed their provisions or withdrew a proposal, thereby mooting the litigation and avoiding a definitive ruling. The plaintiff in this case obtained relief on the merits. If anything, the current case warrants a larger award than the mootness fee in the *Exclusive Forum* litigation. *See Berger v. Pubco Corp.*, 2008 WL 4173860, at \*2 (Del. Ch. Sept. 8, 2008) ("Rather than being settled, this case resulted in a final ruling on the motion for summary judgment . . . . Seeing the claim through to judgment lends weight to a higher award, both because of the greater risk inherent in litigation . . . and because of the greater legal work required to obtain the judgment.").

The more significant issue is whether to consider the *Exclusive Forum* award in the aggregate or on a per-company basis. Factually, the *Exclusive Forum* defendants paid on a per-company basis, but that appears to have been a matter of logistics. When discussing the magnitude of the award, the Chancellor focused on the significance of the issue that the complaints had raised, not the number of companies involved. *See Exclusive Forum*, Consol. C.A. No. 7216-CS, at 9, 11, 16–17, 20, 22. He viewed the per-company payment as a way of "allocating things." *See id.* at 31; *accord id.* at 36 (describing "the 400 [as a way to] allocate it in some rational way across everybody"). To that end, he advised defense

7

counsel that "people shouldn't fixate on something like the 400 per" and should instead "be focused on [the removal of] a sufficiently important bylaw that our board took time on it." *Id.* at 37. If the plaintiffs had sued twice as many companies, I do not think he would have endorsed applying the same per-company figure to generate an aggregate award twice as large. Nor do I think he would have cut the award dramatically if the plaintiffs had sued half as many companies.

As Chief Justice Strine recognized in the *Exclusive Forum* case, conceptually similar questions about how to price a litigation benefit arise when plaintiffs challenge the same governance issue in a series of cases involving multiple companies. *See id.* at 21 ("[W]here people get successive victories . . . . , at some point that has to be taken into account."). For example, in the seminal dead-hand rights plan case, this court denied a motion to dismiss a complaint challenging a dead-hand pill. *See Carmody v. Toll Bros., Inc.*, 723 A.2d 1180 (Del. Ch. 1998). The parties reached a settlement based on the removal of the feature, and the court approved an agreed-upon fee of $525,000, equivalent to $817,000 in inflation-adjusted dollars. *See Carmody v. Toll Bros., Inc.*, C.A. No. 15983, at 4–5 (Del. Ch. Feb. 11, 1999) (TRANSCRIPT). Having been in practice when *Carmody* was decided, I recall a succession of follow-on suits that resulted in steadily lower fee awards, but neither the parties nor the court has been able to locate rulings from that era. In a more recent lawsuit that challenged a dead-hand pill, the parties agreed to a mootness fee of $300,000, after the defendants had mooted the complaint two weeks after it was filed. *See Norfolk Cty. Ret. Sys. v. Ahn*, C.A. No. 10727-VCG (Del. Ch. July 6, 2016) (ORDER).

8

The awards in litigation challenging dead-hand proxy puts in credit agreements show a similar pattern. In the two leading decisions addressing the validity of the provisions, the plaintiffs were awarded $2.5 million and $2.9 million, respectively. *See Kallick v. SandRidge Energy, Inc.*, C.A. No. 8182-CS (Del. Ch. Oct. 30, 2013) (ORDER) ($2.5 million); *San Antonio Fire & Police Pension Fund v. Bradbury* (*Amylin*), 2010 WL 4273171, at *13 (Del. Ch. Oct. 28, 2010) ($2.9 million). In a later case that settled after a decision denying a motion to dismiss, the plaintiffs received $1.2 million. *See Pontiac Gen. Empls.' Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, at 41–42 (Del. Ch. May 8, 2015) (TRANSCRIPT). In subsequent cases that did not involve significant litigation, the court approved materially lower fees ranging from $128,000 to $500,000.[2] In a more recent case that involved significant litigation, an active proxy contest, and a contested fee application, the court awarded $1.5 million. *See Marcato Int'l Master Fund, Ltd. v. Gibbons*, C.A. No. 2017-0751-JTL, at 57–59 (Del. Ch. May 25, 2018) (TRANSCRIPT).

---

[2] *See McCormack v. BioScrip, Inc.*, C.A. No. 11480-CB (Del. Ch. Jan. 14, 2016) (ORDER) ($130,000); *David Shaev Profit Sharing Account v. HSN, Inc.*, C.A. No. 10919-CB (Del. Ch. Oct. 6, 2015) (ORDER) ($150,000); *Doppelt v. Peabody Energy Corp.*, C.A. No. 10597-CB (Del. Ch. July 21, 2015) (ORDER) ($300,000); *Plumbers Local 98 Defined Benefit Fund v. Rattie*, C.A. No. 10405-VCN (Del. Ch. June 30, 2015) (ORDER) ($300,000); *Ironworkers Local No. 25 Pension Fund v. Peterson*, C.A. No. 10701-VCN (Del. Ch. June 18, 2015) (ORDER) ($285,000); *Ironworkers Local No. 25 Pension Fund v. Doheny*, C.A. No. 10341-VCP (Del. Ch. June 5, 2015) (ORDER) ($300,000); *In re MGM Resorts Int'l Litig.*, C.A. No. 10290-VCG (Del. Ch. May 28, 2015) (ORDER) ($500,000); *Fire & Police Pension Fund v. Stanzione*, C.A. No. 10078-VCG, at 8–9 (Del. Ch. Feb. 25, 2015) (TRANSCRIPT) ($128,000).

9

In each scenario, whether in a single case or a series of cases, stockholder plaintiffs sued multiple companies, generating both per-company awards and an aggregate recovery. Although the precedents do not provide a basis for strong conclusions (such as an indicative rate at which awards tail off when multiple companies are involved), they do suggest that Delaware courts grant substantial awards for precedent-setting cases, then materially lesser fees for follow-on cases. Only if a suit against a subsequent issuer itself involves a significant factual permutation or an additional dimension to the legal issue would that later suit warrant a substantial award. This approach indicates that what matters is the legal issue that has been addressed, not the number of companies involved.

Focusing on the aggregate award rather than on the per-company payment also seems warranted in terms of the incentives created for plaintiffs' counsel. Corporate lawyers are excellent mimics, and multiple companies often adopt similar corporate governance measures. A plaintiff who wishes to challenge a particular initiative usually will have a choice of defendants to sue. If awards were calculated on a per-company basis, then a plaintiff would have an incentive to sue as many companies as possible in the hope of generating a larger fee. Under the doctrine of *stare decisis*, litigation in one case can establish a precedent that applies to other situations. It is neither necessary nor desirable to have many companies sued on the same issue. It is true, as the defendants point out, that this results in a negative lottery for defendants, in which one company bears the brunt of the fee award for establishing a precedent. *See Exclusive Forum*, Consol. C.A. No. 7216-CS, at 36. But that outcome is more reasonable than it might originally appear. Insurance spreads the risk, and the costs and benefits for an individual company balance out over

10

time. Although one corporation might be sued on one issue and pay a sizeable fee award, that same corporation is unlikely to be targeted on every governance issue. In cases where other companies are sued, the non-sued corporations gain the benefit of precedent without any incremental cost.

The plaintiffs' recovery in *Exclusive Forum* is thus best viewed as an aggregate award of at least $3 million. As such, it supports the plaintiff's request in this case for an award of $3 million. The awards in the first two dead-hand-proxy-put cases also support the plaintiff's request. Adjusted for inflation, the $2.9 million awarded in *Amylin* in October 2010 equates to $3.39 million today. The $2.5 million awarded in *SandRidge* in October 2013 equates to $2.74 million today. Another indicative precedent is the award of $2.5 million in July 2010 in the *Kurz v. Holbrook* litigation, which equates to $2.94 million today. The *Kurz* litigation also involved a bylaw challenge, and the award compensated plaintiffs' counsel for invalidating a provision that purported to remove directors by reducing size of board. *See Kurz v. Holbrook*, 2010 WL 3028003 (Del. Ch. July 29, 2010), *aff'd sub nom. EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429 (Del. 2012).

Assuming for the sake of analysis that I considered the award on a per-company basis, then the plaintiff's requested award of $1 million per company is reasonable. If the *Exclusive Forum* award is evaluated on a per-company basis, then I believe it undervalues the benefit conferred for the same reason that then-Chancellor Strine identified during the office conference: An award of $364,723 is materially less than what defendants were paying to resolve non-substantive challenges to mergers during the heyday of disclosure-only settlements. More apt precedents include the inflation-adjusted award of $817,000 in

11

*Carmody* ($525,000 in February 1999), the inflation-adjusted award of $1.29 million in *Ballantine* ($1.2 million in May 2015), the May 2018 award of $1.5 million in *Marcato*, and the inflation-adjusted award of $829,520 in *Vaalco* ($775,000 in April 2016). *See In re Vaalco Energy, Inc. S'holder Litig.*, C.A. No. 11775-VCL (Del. Ch. Apr. 20, 2016) (ORDER) (awarding fees for successful invalidation of director-removal provision).

Based on these precedents, the plaintiff's request of $3 million is reasonable. The defendants' proposal is not reasonable. To use the Chief Justice's phrase, it is a "party mix number" that would dramatically undercompensate plaintiff's counsel for the result they achieved. This decision therefore uses an all-in award of $3 million as a starting point for analysis.

### 2. The Time And Effort Of Counsel

"The time and effort expended by counsel serves as a cross-check on the reasonableness of a fee award. This factor has two separate but related components: (i) time and (ii) effort." *Sauer-Danfoss*, 65 A.3d at 1138 (citation omitted). Both are secondary factors, because the real measure of a fee award lies in the results achieved. Putting too much weight on time and effort could result in either undercompensation or overcompensation. On the one hand, "[c]ounsel should not be penalized for achieving complete victory quickly." *Olson*, 2011 WL 704409, at *15. On the other hand, counsel should not be rewarded for dragging out cases, incurring unnecessary hours or, even worse, exaggerating the number of hours worked.

The defendants argue for a *quantum meruit* award under which the court would start with the time incurred and the hourly billing rate of plaintiff's counsel to generate a

12

lodestar, then apply a multiple to generate an award. Delaware has not generally followed the lodestar method, preferring instead to focus on the benefit conferred. *See Ams. Mining*, 51 A.3d at 1254; *Seinfeld v. Coker*, 847 A.2d 330, 335–36 (Del. Ch. 2000). The defendants correctly point out that Delaware has eschewed the lodestar method principally for cases resulting in common funds or quantifiable common benefits, but the criticisms of the lodestar method apply equally to therapeutic benefit cases.

> As the federal courts learned while experimenting with the lodestar method, emphasizing time encourages attorneys presenting fee petitions to engage in duplicative and unjustified work, inflate their "normal" billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may disallow.

*Sauer-Danfoss*, 65 A.3d at 1138 (alteration and internal quotation marks omitted).

Given these drawbacks, if there are precedents on which to base a fee award, as in this case, then a court should look in the first instance to those precedents. Only if the court lacks any yardstick to value a therapeutic benefit should a court fall back to the *quantum meruit* version of the lodestar approach. *See Off v. Ross*, 2009 WL 4725978, at *7 (Del. Ch. Dec. 10, 2009).

Plaintiff's counsel spent 266.4 hours litigating the merits, a figure that excludes the time spent pursuing the fee application and dealing with the defendants' premature attempt to appeal. A bit of long division shows that a fee award of $3 million would work out to $11,262.26 per hour, which sounds excessive. But that headline figure only tells part of the story. Because the defendants intend to appeal the Merits Decision, plaintiff's counsel can expect to expend approximately the same number of hours litigating before the Delaware Supreme Court. Assuming a total investment of 500 hours, an award of $3 million works

13

out to $6,000 per hour. That lofty rate remains unachievable for lawyers paid by the hour, but plaintiff's counsel litigated on contingency. If they lose (and they could lose on appeal), then they get nothing.

The relatively low number of hours that plaintiff's counsel incurred in this case also fails to reflect the overall value of counsel's investment, because they first developed the arguments that prevailed in this case during the course of other litigation. *See* Motion to Remand at 10–15, *Iuso v. Snap, Inc.*, No. 3:17-cv-04806 (N.D. Cal. Aug. 24, 2017). Drawing on work done in a related action does not warrant a lower award. "Rather, it supports a higher award because plaintiff's counsel are experienced . . . and were, therefore, able to prosecute this action in a diligent and competent manner." *Pubco*, 2008 WL 4173860, at *2 (alteration and internal quotation marks omitted).

The defendants also argue that the court should consider what the defendants incurred to defend the action as a cross-check on the plaintiff's award. They correctly observe that a court may consider comparable arm's-length fee arrangements when deciding on an award. *See, e.g.*, *Wis. Inv. Bd. v. Bartlett*, 2002 WL 568417, at *6 (Del. Ch. Apr. 9, 2002), *aff'd*, 808 A.2d 1205 (Del. 2002) ("[A]n arm's-length agreement, particularly with a sophisticated client . . . can provide an initial 'rough cut' of a commercially reasonable fee."). But the defendants' fee arrangements are not comparable. Wilson Sonsini Goodrich & Rosati P.C. agreed to a flat fee, and that makes sense given its significant market presence as counsel to IPO-focused corporations that are likely to employ provisions like those challenged here, its ability to capture advisory work related to those provisions, and the reputational benefits that flow from being the lead defense firm

14

on the case that will determine whether the provisions are valid. These differing incentives also mean that Wilson Sonsini's fee arrangement is not a realistic barometer of a reasonable fee for plaintiff's counsel. The other defense counsel took a secondary role, and the lead forwarding firm gave their client a 15% discount, so those fee arrangements are also not good indicators.

That said, under a lodestar approach, the defendants' fees fall into the same ballpark as the plaintiff's request. If Wilson Sonsini had charged by the hour, then it would have incurred $512,716, giving the defense team an aggregate lodestar through the end of 2018 of approximately $687,000. If the defense team incurred the same lodestar on appeal, their total lodestar would be just shy of $1.4 million. Plaintiff's counsel's fee of $3 million would reflect a multiplier of 2.2 times the defense figure, which would not be unreasonable given that plaintiff's counsel litigated on contingency. *See Schmelzer v. TeraMedica, Inc.*, C.A. No. 10558-VCG, at 52 (Del. Ch. June 22, 2015) (TRANSCRIPT) (describing an award of two times defendants' fees as not being "particularly unreasonable").

Although the plaintiff prevailed at a relatively early stage of the case, and accordingly incurred a relatively small number of hours to date, I do not believe that this factor warrants reducing the precedent-based award. I have considered the time-and-effort factor as a cross-check, and I am satisfied that the award checks out.

### 3. The Extent Of The Contingency Risk

A secondary *Sugarland* factor is the degree of contingency risk that counsel undertook. Some degree of contingency risk is a prerequisite for a risk-based award: If counsel were paid by the hour, then they can at most receive reimbursement of their fees

and expenses. But just because a lawyer works on contingency does not automatically warrant a significant award. "Not all contingent cases involve the same level of contingency risk." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1073 (Del. Ch. 2015).

In this case, counsel faced legitimate contingency risk, and they continue to face contingency risk. Counsel did not enter the case with a ready-made exit or obvious settlement opportunity. They faced significant adversaries who believed in the validity of the provisions they had adopted, and any outcome was likely to be an all-or-nothing proposition. It remains possible that on appeal, which the defendants have already attempted to pursue, the Delaware Supreme Court could disagree with the Merits Decision. In that event, plaintiff's counsel will receive zero.

The level of contingency risk present in this case would support an award higher than what the plaintiffs received in the *Exclusive Forum* litigation. While this case continues to involve true contingency risk, the award in the *Exclusive Forum* litigation resulted from the mooting of thirteen legal challenges at an early stage, which eliminated any risk for the plaintiffs. The fact that the plaintiff in this case is receiving a comparable amount, despite counsel facing greater contingency risk, supports the reasonableness of the award.

### 4. The Complexity Of The Litigation

"One of the secondary *Sugarland* factors is the complexity of the litigation. All else equal, litigation that is challenging and complex supports a higher fee award." *Activision*, 124 A.3d at 1072. This litigation was relatively complex. The case presented a question of

16

first impression that required a detailed understanding of both the federal securities laws and Delaware's corporate law. The plaintiff also advanced nuanced public policy arguments. The degree of complexity posed by the litigation supports the reasonableness of the requested award. It does not call for either an upward or downward departure.

5. **The Standing And Ability Of Counsel**

"Law firms establish a track record over time, and they 'build (and sometimes burn) reputational capital.'" *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *9 (Del. Ch. Dec. 31, 2010) (quoting *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 956 (Del. Ch. 2010)). Plaintiff's counsel is well known to the court. Their skill and experience support the requested award. It does not warrant either an upward or downward departure.

\* \* \*

Under *Sugarland*, an all-in award of fees and expenses in the amount of $3 million is reasonable. The nominal defendants shall pay this amount to the plaintiff, with each nominal defendant paying $1 million.

17